UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                        :

23–34 94th St. Grocery Corp., Kissena Blvd.  :
Convenience Store, Inc., New York Association of  :
Convenience Stores, New York State Association  :
of Service Stations and Repair Shops, Inc.,  :
Lorillard Tobacco Company, Philip Morris USA  :
Inc., and R.J. Reynolds Tobacco Co., Inc.,  :
  :
              Plaintiffs,  :
  :
v.  :     10 CV 4392 (JSR)
  :
New York City Board of Health, New York City  :
Department of Health and Mental Hygiene, New  :
York City Department of Consumer Affairs,  :
Dr. Thomas Farley, in his official capacity as  :
Commissioner of the New York City Department  :
of Health and Mental Hygiene, and Jonathan  :
Mintz, in his official capacity as Commissioner of  :
the New York City Department of Consumer  :
Affairs,  :
  :
            Defendants.  :
  :
-----------------------------------------------------------------x

**MEMORANDUM OF *AMICI CURIAE* AMERICAN LEGACY FOUNDATION, ET AL.,
IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
AND IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTEREST OF *AMICI CURIAE* ......................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 2

ARGUMENT .......................................................................................................................... 3

I.   RESOLUTION § 181.19 IS TAILORED TO ADVANCE THE CITY'S COMPELLING INTEREST
     IN ALERTING CONSUMERS TO THE SERIOUS HEALTH DANGERS OF TOBACCO USE .............. 3

     A.   Empirical Data Support the City's Adoption of Resolution § 181.19 ..................... 3

     B.   The City's Anti-Smoking Signs Are A Proven Means To Advance Its
          Compelling Interest ........................................................................................... 5

          1.   The Use of a Graphic on Anti-Smoking Signs Significantly Increases
               Their Effectiveness ..................................................................................... 5

          2.   The Size of the Signs Is Necessary To Achieve Their Purpose ................... 7

          3.   Placing the Anti-Smoking Signs at the Point of Sale Maximizes Their
               Effectiveness .............................................................................................. 7

          4.   The "Quit Smoking Today: Call 311 Or 1-866-NYQUITS" Call to
               Action Directly Advances the Goals of Resolution § 181.19 ...................... 9

          5.   Plaintiffs' Proposed Alternatives Would Not Achieve the Same Level
               of Success as Resolution § 181.19's Anti-Smoking Signs ........................ 11

II.  THE HEALTH WARNINGS REQUIRED BY RESOLUTION § 181.19 DO NOT INVOLVE
     COMPELLED IDEOLOGICAL SPEECH .................................................................................. 11

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

## CASES

*Commonwealth Brands, Inc. v. United States*,
  678 F. Supp. 2d 512 (W.D. Ky, 2010), *appeal docketed*, No. 10-5234 (6th Cir. 2010)....12, 13

*Dutchess/Putnam Restaurant & Tavern Association, Inc. v. Putnam County Department of Health*,
  178 F. Supp. 2d 396 (S.D.N.Y. 2001)..................................................................................12

*Entertainment Software Association v. Blagojevich*,
  469 F.3d 641 (7th Cir. 2006) ...........................................................................................13

*Hurley v. Irish-American Gay, Lesbian and & Bisexual Group of Boston, Inc.*,
  515 U.S. 557 (1995)..........................................................................................................14

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952)..........................................................................................................13

*Miami Herald Publishing Co. v. Tornillo*,
  418 U.S. 241 (1974)..........................................................................................................14

*Pacific Gas & Electric Co. v. Public Utility Commission of California*,
  475 U.S. 1 (1986)........................................................................................................14, 15

*PruneYard Shopping Center v. Robins*,
  447 U.S. 74 (1980)............................................................................................................15

*West Virginia State Board of Education v. Barnette*,
  319 U.S. 624 (1943)..........................................................................................................11

*Wooley v. Maynard*,
  430 U.S. 7053 (1977)........................................................................................................11

## STATUTES & RULES

21 C.F.R., § 101.17(g) (2010).................................................................................................12

21 C.F.R. § 336.50 (2010) .....................................................................................................14

40 C.F.R. § 156.64 (2010) .....................................................................................................13

40 C.F.R. § 156.66 (2010) .....................................................................................................14

7 U.S.C. § 136(q)(2)(D) ................................................................................................13

15 U.S.C. § 1278(a)(2) ..................................................................................................12

15 U.S.C. § 1278(b)(2)(A) .............................................................................................14

15 U.S.C. § 1333 ...........................................................................................................12

Family Smoking Prevention & Tobacco Control Act of 2009, Pub. L. No. 111-31, § 201,
    123 Stat. 1776 (to be codified at 15 U.S.C. § 1333(d)) ............................................6

## OTHER AUTHORITIES

Ajzen, *The Theory of Planned Behavior*, 50 Organizational Behavior and Human
    Decision Processes 179 (1991)*, available at*
    http://www.courses.umass.edu/psyc661/pdf/tpb.obhdp.pdf ......................................9

Armour *et al.*, *State-Level Medicaid Expenditures Attributable to Smoking,* Preventative
    Chronic Disease (July 2009), *available at*
    http://www.tcln.org/schedule/docs/072809/MedicaidExpendituresSmoking.pdf ...................4

Bergen *et al.*, *Effects of Energy-Content Labels & Motivational Posters on Sales of
    Sugar-Sweetened Beverages: Stimulating Sales of Diet Drinks Among Adults Study*,
    106 J. Am. Dietetic Ass'n 1866 (Nov. 2006) ..........................................................8

Biener *et al.*, *Adults' Response to Massachusetts Anti-Tobacco Television
    Advertisements: Impact of Viewer & Advertisement Characteristics*, 9 Tobacco
    Control 401 (2000), *available at*
    http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1748390/pdf/v009p00401.pdf ..........................7

Carter *et al.*, *The Effect of Retail Cigarette Pack Displays on Unplanned Purchases:
    Results from Immediate Postpurchase Interviews*, 18 Tobacco Control 218 (2009)................8

Centers for Disease Control & Prevention, *Cigarette Smoking Among Adults and Trends
    In Smoking Cessation - United States, 2008*, 58 Morbidity & Mortality Wkly. Rep.
    1227 (2009), *available at*
    http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5844a2.htm ...........................................10

Centers for Disease Control & Prevention, *Cigarette Smoking-Attributable Morbidity -
    United States, 2000*, 52 Morbidity & Mortality Wkly. Rep. 842 (2003), *available at*
    http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5235a4.htm ...........................................12

Centers for Disease Control & Prevention, *Smoking-Attributable Mortality, Years of Potential Life Lost, and Productivity Losses—United States, 2000-2004*, 57 Morbidity & Mortality Wkly. Rep. 1226 (2008), *available at*, http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5745a3.htm ......................................4, 12

Centers for Disease Control & Prevention, Nat'l Center for Chronic Disease Prevention & Health Promotion, Office on Smoking & Health, *The Health Consequences of Smoking: A Report of the Surgeon General*, *available at* http://www.cdc.gov/tobacco/data_statistics/sgr/2004/complete_report/index.htm ................12

DiFranza *et al.*, *Initial Symptoms of Nicotine Dependence in Adolescents*, 9 Tobacco Control 313 (2000), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1748379/pdf/v009p00313.pdf ......................4

Federal Trade Commission, *Cigarette Report for 2006* (2009), *available at* http://www.ftc.gov/os/2009/08/090812cigarettereport.pdf ...................................................8

French *et al.*, *Price Pricing and Promotion Effects on Low-Fat Vending Snack Purchases: The CHIPS Study*, 91 Am. J. Pub. Health 112 (2001), *available at* http://ajph.aphapublications.org/cgi/reprint/91/1/112................................................8

Hammond *et al.*, *Effectiveness of Cigarette Warning Labels in Informing Smokers About the Risks of Smoking: Findings from the Int'l Tobacco Control Four Country Survey*, 15 Tobacco Control (Supp. III) (2006), *available at* http://tobaccocontrol.bmj.com/content/15/suppl_3/iii19.full.pdf .............................7

Hammond *et al.*, *Showing Leads to Doing: Graphic Cigarette Warning Labels Are an Effective Public Health Policy*, 16 Eur. J. Pub. Health 223 (2006), *available at* http://eurpub.oxfordjournals.org/cgi/reprint/16/2/223 .................................................6

Hammond *et al.*, *Text & Graphic Warnings on Cigarette Packages: Findings from the Int'l Tobacco Control Four Country Study*, 32 Am. J. Prev. Med. 210 (2007), *available at* http://tobaccofreekids.org/pressoffice/hammond0207.pdf ...............................5, 7

Hammond *et al.*, *The Impact of Cigarette Warning Labels & Smoke-Free Bylaws on Smoking Cessation: Evidence from Former Smokers*, 95 Can. J. Pub. Health 201 (2004), *available at* http://www.tobaccolabels.ca/healt/canad~6?action .................................6

International Tobacco Control Policy Evaluation Project, *FCTC Article 11 Tobacco Warning Labels*, ITC Project Report (May 2009), *available at* http://www.roswelltturc.org/warnings/ITCwarningreport.pdf...................................6

Miller *et al.*, *Impact on the Australian Quitline of New Graphic Cigarette Pack Warnings Including the Quitline Number*, 18 Tobacco Control 235 (2009), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2679186/pdf/CLU-18-03-0235.pdf ..............9

Smith, *Social Marketing: An Overview of Approach and Effects*, 12 Injury Prevention (Supp. I) i38 (2006), *available at* http://injuryprevention.bmj.com/content/12/suppl_1/i38.full.pdf ............................................10

Sutherland *et al.*, *Guiding Stars: The Effect of a Nutrition Navigation Program on Consumer Purchases at the Supermarket*, 91 Am. J. Clin. Nutrition (Supp.) 1090S (2010) ........8

U.S. Dep't of Health & Human Services, *Treating Tobacco Use and Dependence: 2008 Update* (2008), *available at* http://www.surgeongeneral.gov/tobacco/treating_tobacco_use08.pdf ...................................10

Wakefield *et al.*, *An Experimental Study of Effects on Schoolchildren of Exposure to Point-of-Sale Cigarette Advertising and Pack Displays*, 21 Health Educ. Res. 338 (2006), *available at* http://her.oxfordjournals.org/cgi/reprint/21/3/338?maxtoshow=&hits=10&RESULTF ORMAT=&fulltext=exposure+to+point-of-sale+cigarette+advertising&searchid=1&FIRSTINDEX=0&resourcetype=HWCIT ..............9

Wakefield *et al.*, *Effects of Anti-Smoking Advertising on Youth Smoking: A Review*, 8 J. Health Comm. 229 (2003), *available at* http://www.tern.org/pdf%20articles/Effects%20of%20Anti-smoking%20advertising%20on%20youth%20smoking-a%20review.pdf ...........................6, 7

Wakefield *et al.*, *Saved by the Bell: The Role of Telephone Helpline Services in the Context of Mass-Media Anti-Smoking Campaigns*, 9 Tobacco Control 117 (2000), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1748351/pdf/v009p00117.pdf ....................10

Wakefield *et al.*, *Tobacco Industry Marketing at Point of Purchase After the 1998 MSA Billboard Advertising Ban*, 92 Am. J. Pub. Health 937 (2002), *available at* http://ajph.aphapublications.org/cgi/reprint/92/6/937.pdf ........................................................9

## INTEREST OF *AMICI CURIAE*

*Amici* include non-profit public health organizations and advocacy groups that for decades have worked to educate the public about, and to protect the public from, the devastating health and economic consequences of tobacco use.[1]  *Amici* engage in tobacco-related public health research and public education efforts to inform the public of the risks of tobacco use and to develop strategies and resources to help people quit smoking and other tobacco use.  *Amici* have wide experience concerning laws and regulations to increase public awareness of the dangers of tobacco use, as well as other public health concerns.  *Amici* submit this brief to explain to the Court that the measures adopted by the New York City Board of Health, requiring visible and vivid warnings about the dangers of tobacco use at the point of sale of tobacco products, and calling on potential consumers of tobacco products to quit smoking immediately, are exactly the kinds of public health measures that are effective in combating tobacco use, which is one of the most serious public health challenges in the United States today.

---

[1]      *Amici* are the following organizations:  American Legacy Foundation, American Academy of Pediatrics, American Cancer Society, ACS Cancer Action Network, American College of Preventive Medicine, American Lung Association, American Lung Association in New York, American Medical Association, American Public Health Association, Asian Pacific Partners for Empowerment, Advocacy and Leadership, Campaign for Tobacco-Free Kids, Citizens' Commission to Protect the Truth, Faith United Against Tobacco, Lung Cancer Alliance, Massachusetts Association of Health Boards, Medical Society of the State of New York, National African American Tobacco Prevention Network, National Association of Chronic Disease Directors, National Association of County and City Health Officials, National Association of Local Boards of Health, National Coalition for LGBT Health, National LGBT Tobacco Control Network, Oncology Nursing Society, Partnership for Prevention, and Tobacco Control Legal Consortium.  A description of each *amicus* and its interest in this litigation was included as an appendix to the Memorandum in Support of the Notice of Motion of American Legacy Foundation, et al., for Leave to File as *Amici Curiae* (filed July 22, 2010).  A revised version of that description, which includes the addition of the American College of Preventive Medicine, is included as an appendix to this Memorandum.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Tobacco use is the leading preventable cause of death in New York City and the United States and a major cause of disease and disability.  It is responsible for an estimated 443,000 deaths nationwide each year—more than AIDS, alcohol, car accidents, fires, homicides, and suicides *combined*—amounting to nearly one out of every five deaths annually in the United States.  Approximately 8.6 million Americans suffer from serious tobacco-related disease. Despite this human toll—and despite extensive public health efforts over decades to make known the grave dangers of smoking and tobacco use—roughly 950 children and youth under 18 become regular smokers each and every day in this country.

This persistence of tobacco use, especially among children, presents policymakers with a serious public health challenge.  Nicotine is profoundly addictive, and that addiction is exceedingly difficult to shake.  Policymakers have experimented with many approaches over the past decades to make inroads on tobacco addiction, and while progress has been made in encouraging consumers not to take up smoking and to quit smoking, experts have concluded that more vivid public-health messaging is necessary to discourage demand for tobacco products and to assist smokers in quitting smoking.

The health warnings required by Resolution § 181.19 are a critically effective means of alerting New York consumers to the serious dangers of tobacco use at an especially important point—when they are contemplating purchasing a tobacco product—and are appropriately tailored to advance the City's compelling interest in curbing tobacco use.  The Resolution's requirement that purely factual health warnings be posted where tobacco products are sold does not—as Plaintiffs contend (Pl. Mem. 20-23)—warrant strict scrutiny review.  *See* Def. Mem. 10-19.  But even if Plaintiffs' argument were to be credited, Resolution § 181.19 satisfies that standard.

The required warnings contain three important elements that have been challenged by Plaintiffs, but each element plays a direct and important role in advancing the City's interest in curbing tobacco use.  First, empirical research establishes that messages at the point of sale are particularly effective in influencing consumer behavior, including influencing consumers not to purchase tobacco products.  Second, research finds that using vivid language and images in health warnings significantly raises the likelihood that consumers—particularly young consumers—will register the warnings and respond to them.  Third, research underscores the importance of a direct "call to action"—*i.e.*, calling on consumers directly to change their behavior, rather than merely providing reasons to *think about* changing their behavior.

Plaintiffs do not contend that any of the information in the required warnings is factually incorrect or misleading.  They also recognize that tobacco products pose serious dangers to consumers' health, and indeed they acknowledge that the "best way" for users to avoid those dangers is to quit using tobacco immediately.  Pl. Mem. 18.  Yet they claim a First Amendment right to exclude, from commercial premises, government information telling consumers exactly that, and they analogize their situation to one of compelled ideological speech, such as a Jehovah's Witness whose religious conviction commits him not to salute the flag.  The purported analogy is inapt, and if adopted, could cast doubt on a wide array of required health warnings and advisories that are an essential component of government efforts to protect the health and safety of the public.

## ARGUMENT

**I.    RESOLUTION § 181.19 IS TAILORED TO ADVANCE THE CITY'S COMPELLING INTEREST IN ALERTING CONSUMERS TO THE SERIOUS HEALTH DANGERS OF TOBACCO USE**

### A.    Empirical Data Support the City's Adoption of Resolution § 181.19

Resolution § 181.19 is well designed to address a compelling governmental interest—to help as many New York City residents as possible quit smoking.  More than 950,000 adults and

20,000 public high school students in New York City smoke.  Declaration of Jennifer H. Rearden in Support of Pls.' Mot. for Summ. J. ("Rearden Decl.") Exh. C at 2.  Cigarette use is strongly addictive, often giving rise to symptoms of dependence within days or weeks of the first cigarette smoked.  DiFranza *et al.*, *Initial Symptoms of Nicotine Dependence in Adolescents*, 9 Tobacco Control 313, 317 (2000).

Nationally, "cigarette smoking and exposure to secondhand smoke resulted in an estimated 443,000 deaths and 5.1 million years of potential life lost (YPLL) annually" during 2000-2004.  Centers for Disease Control & Prevention, *Smoking-Attributable Mortality, Years of Potential Life Lost, and Productivity Losses—United States, 2000-2004*, 57 Morbidity & Mortality Wkly. Rep. 1226 (2008).  These deaths are estimated to result in $96.8 billion in lost economic productivity each year.  *Id.*  Eleven percent of all Medicaid expenditures are related to complications due to smoking, and in 2004, $3.3 billion in Medicaid funds were spent on smoking-related health care costs in New York state alone.  Armour *et al.*, *State-Level Medicaid Expenditures Attributable to Smoking,* Preventative Chronic Disease (July 2009).  The significant economic costs associated with smoking—and more importantly, the massive human toll—more than justify the City's adoption of the Resolution to help as many residents as possible quit smoking.

Plaintiffs do not dispute that New York City has a compelling public health interest in reducing the number of residents who purchase and smoke cigarettes, but instead argue that the City should seek to further that interest through other means.  The scientific studies discussed below, however, demonstrate that the features of the signs that the City has designed, as well as the prominent display of those signs in retail establishments, are crucial to achieving its compelling interest of maximizing the number of residents who quit smoking.

**B.      The City's Anti-Smoking Signs Are A Proven Means To Advance Its Compelling Interest**

Resolution § 181.19 directly advances the City's compelling public health interest in curbing tobacco use.  Indeed, a significant body of empirical research demonstrates that warnings of this kind are critically important in alerting consumers to the dangers of smoking and leading addicted smokers to quit.  All features of these warnings—their use of a graphic, their size, their placement at the point-of-sale, and their call-to-action message—are supported by scientific literature and are necessary to make this public health campaign effective.

1.      *The Use of a Graphic on Anti-Smoking Signs Significantly Increases Their Effectiveness*

Plaintiffs criticize the use of "images of decayed teeth, cancer-filled lungs, and damaged brains" on the Resolution § 181.19 signs and state that the "vivid" and "emotional" nature of these images is "a far cry" from the textual warnings mandated on cigarette packages.  Pl. Mem. 22.  They are right that graphic warnings are different from textual warnings—and that difference is key to their effectiveness.  "Pictorial warnings are more effective than text-only warnings, likely *because* they are more emotionally arousing and present the harms of smoking in vivid and memorable ways."  International Tobacco Control Policy Evaluation Project, *FCTC Article 11 Tobacco Warning Labels*, ITC Project Report, at 10 (May 2009) (emphasis added).  Studies consistently find that the greater emotional response triggered by graphics illustrating the effects of tobacco leads to greater awareness and increased memory concerning the health risks of smoking.  Hammond *et al.*, *Text & Graphic Warnings on Cigarette Packages: Findings from the Int'l Tobacco Control Four Country Study*, 32 Am. J. Prev. Med. 210, 215 (2007) [hereinafter, *Text*

*& Graphic Warnings*].  Indeed, federal law will soon require that cigarette packaging include labels with "color graphics depicting the negative health consequences of smoking."[2]

Research shows that anti-smoking signs "which elicit strong emotional arousal … [and] portray the adverse consequences of smoking" are associated with an "increased intention not to smoke" among both adults and teenagers.  *See* Wakefield *et al.*, *Effects of Anti-Smoking Advertising on Youth Smoking: A Review*, 8 J. Health Comm. 229, 240 (2003) [hereinafter, *Effects of Anti-Smoking Advertising*].  "All evidence suggests that graphic warnings are … more likely to be noticed and discussed than text warnings; … [are] associated with increased cessation … [; and] enjoy high credibility and support from smokers themselves."  Hammond *et al.*, *Showing Leads to Doing: Graphic Cigarette Warning Labels Are an Effective Public Health Policy*, 16 Eur. J. Pub. Health 223, 223-24 (2006).  Graphic warnings are also particularly important because they can more effectively reach "low-income or low-literacy individuals who may not have access to other mediums of health information."  *Id. at 224.*

A study of Canadian tobacco warnings confirms that using a graphic in anti-smoking warnings can be the critical component that convinces many individuals to quit smoking.  *See* Hammond *et al.*, *The Impact of Cigarette Warning Labels and Smoke-Free Bylaws on Smoking Cessation*, 95 Can. J. Pub. Health 201, 201 (2004) (finding that study participants who quit smoking after introduction of graphic on warning labels were nearly 3 times more likely to cite the warnings as a motivation to quit than smokers who quit before graphics were introduced).  Studies of other public health campaigns in a variety of contexts confirm the effectiveness of graphic

---

[2]    *See* Family Smoking Prevention & Tobacco Control Act of 2009, Pub. L. No. 111-31, § 201, 123 Stat. 1776, 1845 (to be codified at 15 U.S.C. § 1333(d)) ("Not later than 24 months after the date of enactment of the [Act], the Secretary [of Health & Human Services] shall issue regulations that require color graphics depicting the negative health consequences of smoking to accompany the label statements specified" by the Act).

warnings.  *See* Biener *et al.*, *Adults' Response to Massachusetts Anti-Tobacco Television Advertisements: Impact of Viewer and Advertisement Characteristics*, 9 Tobacco Control 401, 406 (2000).

2.      *The Size of the Signs Is Necessary To Achieve Their Purpose*

Plaintiffs also take issue with the size of the required posters.  Pl. Mem. 25-26.  The Board of Health designed the posters to reflect the lessons of public-health research, *see, e.g.*, Rearden Decl. Exh. C at 7-10, but also accommodated industry concerns about the initial proposal by significantly reducing the size of the posters and providing multiple placement options, Rearden Decl. Exh. A at 4.  Smaller signs are less likely to be noticed, especially given the large number of other notices and advertisements that often compete for the consumer's attention in retail settings.  Studies illustrate that "anti-smoking ads must have adequate share of voice to break through ad clutter, attract attention and persuade."  Wakefield, *Effects of Anti-Smoking Advertising*, *supra*, at 242 (citations omitted).  Consumers' ability to notice the anti-smoking warning is vital to the success of any anti-smoking effort.  A recent study finds that "[s]mokers who reported noticing warnings were between 1.5-3.0 times more likely to believe in each health effect."  Hammond et al., *Effectiveness of Cigarette Warning Labels in Informing Smokers About the Risks of Smoking: Findings from the Int'l Tobacco Control Four Country Survey*, 15 Tobacco Control (Supp. III) iii19, iii23 (2006).  Further, "larger, more vivid warnings are more likely to retain their salience over time than less prominent warnings."  Hammond, *Text & Graphic Warnings*, *supra*, at 215.

3.      *Placing the Anti-Smoking Signs at the Point of Sale Maximizes Their Effectiveness*

Plaintiffs also take issue with the placement of the Resolution § 181.19 posters at the point of sale.  *See* Pl. Mem. 25 ("The signs take up valuable space in key, highly visible locations

in the stores…."). The location of the signs at the point of sale, however, is crucial to their ability to achieve maximum smoking cessation.

Study after study shows the effectiveness of point-of-sale advertising—both in encouraging consumers to make purchases, and in discouraging them from doing so.[3] One study on the effects of placing information regarding healthy beverage options at the point of sale found that the information significantly increased the number of healthier drinks purchased, while decreasing the purchase of drinks high in sugar. *See* Bergen *et al.*, *Effects of Energy-Content Labels & Motivational Posters on Sales of Sugar-Sweetened Beverages: Stimulating Sales of Diet Drinks Among Adults Study*, 106 J. Am. Dietetic Ass'n 1866-69 (Nov. 2006). A similar study, which identified healthy food options by placing "star ratings" on them, also demonstrated that point-of-sale signage affects an individual's future buying habits as well. *See* Sutherland *et al.*, *Guiding Stars: The Effect of a Nutrition Navigation Program on Consumer Purchases at the Supermarket*, 91 Am. J. Clinical Nutrition (Supp.) 1090S, 1092S (2010) ("We also show that the program evaluated not only was effective at bringing about changes in food purchasing immediately after implementation, but also continued to incrementally improve the purchasing of star-rated foods 1 and 2 y[ears] later.").

The point-of-sale characteristic of the Resolution § 181.19 signs is particularly important for the 20,000 New York City public high school students who smoke. Rearden Decl. Exh. C. at 2. Studies show that point-of-sale advertising of cigarettes weakens teenagers' resolve not to smoke. *See, e.g.*, Wakefield *et al.*, *An Experimental Study of Effects on Schoolchildren of*

---

[3]    The tobacco companies well understand the importance of advertising at the point of sale and spent over $240 million on this type of promotion in 2006 alone. *See* Federal Trade Commission, *Cigarette Report for 2006*, at 4 (2009). One study found that "[a]dvertising industry data from the US suggests POS [point-of-sale] displays increase tobacco sales by 12% to 28%." *See* Carter *et al.*, *The Effect of Retail Cigarette Pack Displays on Unplanned Purchases: Results from Immediate Postpurchase Interviews*, 18 Tobacco Control 218, 218 (2009).

*Exposure to Point-of-Sale Cigarette Advertising and Pack Displays*, 21 Health Educ. Res. 338, 345 (2006).  Because "3 of 4 teenagers visit a convenience store at least once per week, these research studies suggest that the point-of-purchase environment may have important influences on youths …."  Wakefield *et al.*, *Tobacco Industry Marketing at Point of Purchase After the 1998 MSA Billboard Advertising Ban*, 92 Am. J. Pub. Health 937, 938 (2002).

Studies also confirm that health information located at the point of sale can influence teenagers' impressions of consumer goods.  *See* French *et al.*, *Pricing and Promotion Effects on Low-Fat Vending Snack Purchases: The CHIPS Study*, 91 Am. J. Pub. Health 112, 114-15 (2001).  The French study found that point-of-sale signs promoting the purchase of low-fat snacks were associated with a statistically significant increase in low-fat snack sales.

4.   *The "Quit Smoking Today: Call 311 Or 1-866-NYQUITS" Call to Action Directly Advances the Goals of Resolution § 181.19*

Plaintiffs argue that the "Quit Smoking Today" call to action is a "far cry" from merely posting a textual advisory warning or a product's calorie content.  Pl. Mem. 22-23.  But just as in the graphic warning context, this difference is crucial to advancing the goals of the Resolution § 181.19 campaign.  Experts refer to a call to action as the "centerpiece of a social marketing campaign.  People want to know what to do, not what to think.  Social marketing is skeptical of the notion that information [alone] leads to behavior change…."  Smith, *Social Marketing: An Overview of Approach and Effects*, 12 Injury Prevention (Supp. I) i38, i39 (2006) (discussing the need for a "call to action" in anti-drunk driving advertisements).  This is consistent with well-established psychological theory that  "perceived control" is an integral part of achieving behavior change.  *See, e.g.*, Ajzen, *The Theory of Planned Behavior*, 50 Organizational Behavior and Human Decision Processes 179, 206 (1991).

- 9 -

The Board of Health's signs emphasize what smokers can do to change their behavior because they provide an avenue through which individuals can take action to quit smoking: "Call 311 Or 1-866-NYQUITS."  Scientific studies consistently find that providing Quitline information is effective in helping smokers to quit.[4]  In an Australian study, Quitline usage *doubled* in the year after a call to action similar to the one here was added to cigarette packages. *See* Miller *et al.*, *Impact on the Australian Quitline of New Graphic Cigarette Pack Warnings Including the Quitline Number*, 18 Tobacco Control 235, 236 (2009).  This finding is not surprising because Quitlines "can be accessed so immediately" and can use the "motivation generated by anti-smoking advertising, thus providing an opportunistic channel for smokers who are motivated to take some kind of action."  Melanie Wakefield & Ron Borland, *Saved by the Bell: The Role of Telephone Helpline Services in the Context of Mass-Media Anti-Smoking Campaigns*, 9 Tobacco Control 117, 118 (2000).

Moreover, the course of action emphasized in the signs is not one with which Plaintiffs appear to disagree.  "If you are concerned about the health effects of smoking," one of the Plaintiff tobacco manufacturers advises, "you should quit."  Pl. Mem. 18.  Similarly, another cigarette manufacturer counsels all tobacco consumers "to be fully and accurately informed about the risks of smoking."  *Id.* at 19.  The City's anti-smoking signs convey that same message through an avenue based on scientific evidence and designed to help the maximum number of New York City residents stop smoking.

---

[4]     It is exceedingly difficult to quit smoking.  Just over 45% of smokers try to shake the habit each year, *see* Centers for Disease Control and Prevention, *Cigarette Smoking Among Adults and Trends In Smoking Cessation – United States, 2008*, 58 Morbidity & Mortality Wkly. Rep. 1227 (2009), but only between 4% and 7% of those who try are successful.  *See* U.S. Dep't of Health & Human Services, *Treating Tobacco Use and Dependence:  2008 Update* at 15 (2008).  Smokers who seek help, however, are significantly more likely to achieve long-term success in quitting.  *Id.* at vi.

     5.     *Plaintiffs' Proposed Alternatives Would Not Achieve the Same Level of Success as Resolution § 181.19's Anti-Smoking Signs*

All of these scientific studies collectively emphasize one crucial point: each aspect of the anti-smoking signs' design furthers the City's compelling interest in helping the maximum number of City residents quit smoking.  These studies also establish that Plaintiffs' proposed "alternatives" will not achieve the same results.  The First Amendment does not require the Board of Health to design posters with less effective content or place them in less visible or more remote locations. The difference, reflected in the number of persons who would not use tobacco products and would quit smoking if they see the Board of Health's signs, is literally a matter of life and death.

## II.    THE HEALTH WARNINGS REQUIRED BY RESOLUTION § 181.19 DO NOT INVOLVE COMPELLED IDEOLOGICAL SPEECH

Plaintiffs erroneously liken the Board of Health's required posting of health warnings to compelled ideological speech, such as the mandatory flag salute invalidated in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), or the requirement that motorists display the motto "Live Free or Die" on vehicle license plates, *see Wooley v. Maynard*, 430 U.S. 705 (1977).  Plaintiffs overlook the enormous differences between a factually based public health warning in a commercial setting, which is at issue here, and the religious, moral, and ideological principles at issue in *Barnette* and *Wooley*.  Indeed, required health warnings on commercial premises and commercial products are commonplace in American society, are a critical component of government's efforts to protect the health of its citizens, and while not all of them may be as vivid as the ones required by Resolution § 181.19, many of them involve similar elements: placement at a critically important point; text or graphics intended to grab attention; and in some cases an exhortation to take particular protective action.

First, the warnings at issue here are factually accurate.  Indeed, Plaintiffs notably do not contend otherwise.  Plaintiffs object to the striking nature of the images on the posters, but as the

Board of Health explains (Def. Mem. 13-14), these images are accurate depictions of certain

real-life health consequences of smoking:  lung cancer, tooth decay, and brain damage caused by

stroke.  Not every person who smokes suffers these consequences, but many do, and the dangers

of these consequences are sufficiently grave that the Board of Health is well justified in warning

the public about them.[5]   In this respect, the required warnings here are no different than the

required warnings on cigarette packs, which have long included the warning that "Smoking

Causes Lung Cancer, Heart Disease, Emphysema, and May Complicate Pregnancy," and which

(under recent federal legislation) must in the future include warnings such as "Cigarettes cause

fatal lung disease," "Cigarettes cause cancer," and "Cigarettes cause stroke and heart disease."

15 U.S.C. § 1333.[6]  Indeed, factually based warnings, required and composed by the government,

about the potential health consequences of commercial products are ubiquitous in our society.

*See, e.g.*, 15 U.S.C. § 1278(a)(2) (requiring certain toys to be labeled "CHOKING HAZARD—

Small parts.  Not for children under 3 yrs."); 21 C.F.R, § 101.17(g) (requiring warning on label

---

[5]      Studies have shown a definitive causal relationship between smoking cigarettes and lung cancer, dental diseases, and stroke.  *See* Centers for Disease Control & Prevention, Nat'l Center for Chronic Disease Prevention & Health Promotion, Office on Smoking & Health, *The Health Consequences of Smoking:  A Report of the Surgeon General* at 14 (lung cancer), 27 (stroke), 29 (dental diseases).  In 2000 there were 184,000 smoking-attributable lung cancer cases and 1,021,000 smoking-attributable stroke cases.  *See* Centers for Disease Control & Prevention, *Cigarette Smoking-Attributable Morbidity – United States, 2000*, 52 Morbidity & Mortality Wkly. Rep. 842 (2003).  From 2000 to 2004, on an annual basis, there were 125,522 smoking-attributable lung cancer deaths (and a few thousand more secondhand-smoke-attributable lung cancer deaths) and 15,922 smoking-attributable stroke deaths.  *See* Centers for Disease Control & Prevention, *Smoking-Attributable Mortality, Years of Potential Life Lost, and Productivity Losses – United States, 2000-2004*, 57 Morbidity & Mortality Wkly. Rep. 1221 (2008).

[6]      *See Commonwealth Brands, Inc. v. United States*, 678 F. Supp. 2d 512, 531 (W.D. Ky, 2010) (upholding revised Surgeon General warnings against First Amendment challenge, and stressing that the content of the warnings is "objective and has not been controversial for many decades"), *appeal docketed*, No. 10-5234 (6th Cir. 2010); *see also Dutchess/Putnam Rest. & Tavern Ass'n, Inc. v. Putnam County Dep't of Health*, 178 F. Supp. 2d 396, 406 (S.D.N.Y. 2001) (rejecting argument that "a sign stating that there are health risks to children from secondhand smoke is an 'ideological' message").

of unpasteurized juice to state: "WARNING: This product has not been pasteurized and, therefore, may contain harmful bacteria that can cause serious illness in children, the elderly, and persons with weakened immune systems.").  Given the pervasive nature of such warnings, it is difficult to credit Plaintiffs' suggestion that an objective observer would attribute the content of the Board of Health-designed posters (which include the label "NYC") to the retailer, rather than understanding it as another government public health advisory in a commercial setting.[7]

Plaintiffs claim they do not object to an accurate warning that cigarette smoking causes lung cancer, but they object to the fact that the warnings include an accurate graphic depiction of what lung disease *looks* like.  The use of graphics does not transform the City's warning signs into the kind of compelled ideological or political slogans invalidated in *Barnette* and *Wooley*.  *See Commonwealth Brands,* 678 F. Supp. 2d at 531 (rejecting First Amendment challenge to requirement of color graphics in new federal tobacco warnings).  The use of arresting images is a common feature of hazard labeling requirements.  *See, e.g.*, 7 U.S.C. § 136(q)(2)(D) (requiring certain pesticides to be labeled with "skull and crossbones" and "the word 'poison' prominently in red on a background of distinctly contrasting color"); 40 C.F.R. § 156.64 (2010) (requiring that pesticide label bear "skull and crossbones symbol … in immediate proximity to the word 'Poison'").

---

[7]    The required warnings are quite different from the required warning stickers invalidated in *Entertainment Software Association v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006).  At issue in that case was whether the State could compel video game retailers to identify games that fell within the definition of "sexually explicit" material under state law.  That definition—unlike the content of the Surgeon General warnings and those at issue here—was imprecise and highly subjective.  *See Commonwealth Brands*, 678 F. Supp. 2d at 531.  Moreover, the State labeling requirement at issue in that case enlisted retailers in stigmatizing particular forms of expression as morally inappropriate for minors due to their sexual content.  *See Entm't Software*, 469 F.3d at 652.  Regulation of speech based on the government's judgments about the value of particular forms of private entertainment or artistic expression has long been an area of particular First Amendment concern.  *See, e.g., Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 505-506 (1952).

Second, there is nothing extraordinary in the Board of Health posters' exhorting consumers to "take action" by advising them to "Quit Smoking Today" and providing a telephone number and website where consumers can obtain information about how to quit smoking.  The law in many instances requires warnings that direct consumers to engage in, or abstain from, particular actions.  *See, e.g.*, 15 U.S.C. § 1278(b)(2)(A) (balloon warning label directing users to "Keep uninflated balloons from children" and "Discard broken balloons at once"); 40 C.F.R. § 156.66 (2010) (pesticide warning label directing users to "Keep Out of Reach of Children"); 21 C.F.R. § 336.50 (2010) (required drug warning directing consumers: "Do not take this product, unless directed by a doctor, if you have [certain medical conditions].").  To invalidate such warnings because they urge action by the consumer would undermine public health measures in a wide variety of contexts.

This case is unlike those circumstances in which requiring a person or entity to accommodate or host others' speech impermissibly interferes with, or requires the speaker to alter, its own expressive message.  *See Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 566 (1995); *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 20-21 (1986); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  At issue in each of those cases was the principle "that a speaker has the autonomy to choose the content of his own message," *Hurley*, 515 U.S. at 573, and the government cannot require a speaker to cede control over its expressive activity to another speaker.  Neither circumstance is present here.  Plaintiffs are manufacturers and retailers, not publishers of newspapers or newsletters or sponsors of a parade.  The Resolution does not interfere with control over their expressive activity.

At most, Plaintiffs contend that the required signs interfere with the sale of products or other promotional materials that would otherwise be placed where the signs are located.  *See* Pl. Mem. 25.  But the same argument could be made about all required warning signs and labels; all

take up space that could potentially be allocated to other products, advertising, marketing information, or other material preferred by a manufacturer or retailer.  Yet interference with product placement is not interference with protected speech, and does not implicate First Amendment interests.  Moreover, unlike *Tornillo*, *Pacific Gas & Electric*, and *Hurley*, the signage requirements of Resolution § 181.19 are triggered not by Plaintiffs' *speech* or *expressive activity*, but rather by the fact that they sell cigarettes and other tobacco products.  Resolution § 181.19 accordingly cannot reasonably be viewed as deterring any speech by Plaintiffs in the first instance.

There is also no reason to conclude that the required health warning signs will be mistakenly identified with the tobacco retailers themselves.  Not only are the signs clearly labeled as government warnings, but consumers are accustomed to associating warnings about the dangers of smoking, as well as other hazards, with public health authorities.  Moreover, *all* tobacco retailers in the City are required by law to display the signs, and so it is extremely unlikely that consumers will mistake the signs for the views of any particular retailer.  This case thus resembles *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), where the Court declined to apply compelled speech principles in upholding a state-law requirement that a privately-owned shopping center allow leafleting and other protected expressive activities on its property.  Central to the Court's reasoning were the fact that the shopping center was open and accessible to the public for business and the fact that the center's owners were unlikely to be identified with the activities at issue and were free to disclaim sponsorship of the message.  *See id.* at 87.  The same is true here: the warnings are posted only in commercial premises to which the public has broad access, and nothing prevents retailers from taking action to disassociate themselves from the warnings.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be denied, and the Court should grant Defendants' Motion for Summary Judgment.

Dated: New York, New York
       August 20, 2010

Respectfully submitted,

By: /s/ Jeremy S. Winer _____

    Patrick J. Carome (admitted *pro hac vice*)
    Paul R.Q. Wolfson (admitted *pro hac vice*)
    Daniel P. Kearney, Jr. (admitted *pro hac vice*)
    WILMER CUTLER PICKERING
    HALE AND DORR LLP
    1875 Pennsylvania Avenue NW
    Washington, DC 20006
    202.663.6000 (tel)
    202.663.6363 (fax)

    Jeremy S. Winer (8823)
    WILMER CUTLER PICKERING
    HALE AND DORR LLP
    399 Park Avenue
    New York, New York 10022
    212.230.8800 (tel)
    212.230.8888 (fax)

    *Attorneys for American Legacy Foundation, et al.*