UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

23–34 94th St. Grocery Corp., *et al.*,

              Plaintiffs,

     v.                                10 CV 4392 (JSR)

New York City Board of Health, *et al.*,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

**PLAINTIFFS' JOINT MEMORANDUM OF LAW OPPOSING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND REPLYING IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ...........................................................................................1

    I.    The Labeling Act Preempts the Resolution. ...........................................4

    II.    The Resolution Violates the First Amendment and the Free Speech Clause of the New York Constitution. ...............................................................11

        A.    The Mandated Signs Are Not Government Speech. ...................................12

        B.    Strict Scrutiny Applies To The City's Forced Speech Campaign. ............16

        C.    The Resolution Fails Strict Scrutiny. .........................................................22

            1.    The City does not have a compelling interest in controlling adult behavior. ................................................................................24

            2.    The Resolution is not narrowly tailored. ........................................24

        D.    The Resolution Would Fail *Zauderer* Review. ...........................................28

    III.    The Resolution Violates New York Separation of Powers Principles. ..................31

CONCLUSION ...............................................................................................35

i

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503, 510 (1996) ...........................................24

*Altria Group, Inc. v. Good*, 129 S. Ct. 538, 544 (2008) ......................................................11, 18

*Am. Kennel Club, Inc. v. City of New York*, Index No. 13584/89, *9–10 (N.Y. Sup. Ct. Sept. 19, 1989) ...................................................................................................................34

*Arizona Life Coalition Inc. v Stanton*, 515 F.3d 956, 964–65 (9th Cir.), *cert. denied sub nom.*, *Stanton v. Arizona Life Coalition*, 129 S. Ct. 56 (2008) ................................................16

*Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004) ...........................................15

*Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984) ..................................................................17, 22

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.20 (1983) ...............................................3

*Boreali v. Axelrod*, 71 N.Y.2d 1, 8–14, 517 N.E.2d 1350, 1353–57 (1987) ..............31, 32, 33, 34

*Caruso v. Yamhill Cnty.*, 422 F.3d 848, 852 (9th Cir. 2005) ........................................................14

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980) .................3

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518, 520 (1992) ..................................................4

*Commonwealth Brands, Inc. v. United States*, 678 F. Supp. 2d 512, 528–32 (W.D. Ky. 2010) ....................................................................................................................................28

*Dutchess/Putnam Rest. v. Putnam Cnty. Dep't of Health*, 178 F. Supp. 2d 396, 402–05 (S.D.N.Y. 2001) ........................................................................................................................32

*Ecko.Complex LLC v. Bloomberg*, 382 F. Supp. 2d 627, 629 (S.D.N.Y. 2005).............................1

*Eclipse Enters., Inc. v. Gulotta*, 134 F.3d 63, 67 (2d Cir. 1977) ..................................................23

*Edenfield v. Fane*, 507 U.S. 761, 767, 770–71 (1993) ................................................................31

*Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652–53 (7th Cir. 2006).................22, 26, 27

*Environmental Defense Center, Inc. v. EPA*, 344 F.3d 832, 850 (9th Cir. 2003)........................19

*Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 573–74 (2d Cir. 2002) ...........................................................................................................................................1

*Firecross Ministries v. Municipality of Ponce*, 204 F. Supp. 2d 244, 250 (D.P.R. 2002)............23

*Greater New York Metro. Food Council, Inc. v. Giuliani*, 195 F.3d 100, 105 (2d Cir. 1999) ......................................................................................................8

*Grosjean v. Bommarito*, 302 F. App'x 430 (6th Cir. 2008)............................................16

*Ibanez v. Florida Dep't of Bus. & Prof'l Registration*, 512 U.S. 136, 146–47 (1994) .............3, 30

*Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 249, 567 N.E.2d 1270, 1277–78 (1991)......................................................................................................24

*Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557, 562–65, 565 n.8 (2005)..............13, 15

*Justiana v. Niagara Cnty. Dep't of Health*, 45 F. Supp. 2d 236, 244 (W.D.N.Y. 1999).........33, 34

*Leonard v. Dutchess Cnty. Dep't of Health*, 105 F. Supp. 2d 258, 266 (S.D.N.Y. 2000)............32

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)........................................... *passim*

*Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974) ....................................27

*Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1339–41 (2010)....17, 18, 29

*Miller v. Johnson*, 515 U.S. 900, 920 (1995)...............................................................22

*National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113–14, 115 (2d Cir. 2001) .................18, 19

*New York Rest. Ass'n v. New York City Board of Health*, 556 F.3d 114, 121 (2d Cir. 2009) .......................................................................................................18, 19

*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 15 n.12 (1986) ........................22

*Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62, 74 (1st Cir. 1997) ......................................10

*Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1129, 1131 (2009)........................................13

*PruneYard Shopping Center v. Robins*, 447 U.S. 74, 78, 87–88, 97 (1980) .................................16

*R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ....................................................................17

*R.J. Reynolds Tobacco Co. v. Shewry,* 423 F.3d 906, 911, 915 (9th Cir. 2005)............................15

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795, 800 (1988)......................17, 25

*Rockwood v. City of Burlington*, 21 F. Supp. 2d 411, 418, 420 (D. Vt. 1998) ............................8, 9

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002) ......................................................24

*Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp. of Am.*, 419 F.3d 181, 190 (2d Cir. 2005)............................................................................................................2

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000) ....................................... *passim*

*Vango Media, Inc. v. City of New York*, 34 F.3d 68, 70, 72, 74–75 (2d Cir. 1994)................4, 6, 7

*West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 632–33 (1943) ............................15, 21, 23

*Wooley v. Maynard*, 430 U.S. 705 (1977) .......................................................................... *passim*

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ....................................... *passim*

## Statutes

15 U.S.C. § 1331.....................................................................................................................2, 4, 11

15 U.S.C. § 1333(d) ........................................................................................................................9

15 U.S.C. § 1334(a) ........................................................................................................................4

15 U.S.C. § 1334(b) ........................................................................................................................4

15 U.S.C. § 1334(c) ........................................................................................................................8

## Rules

Fed. R. Civ. P. 56 .......................................................................................................................2, 3

Local Civil Rule 56.1 ......................................................................................................................3

Rules of the City of New York § 10-01 *et seq.*...........................................................................34

## Regulations

New York City Administrative Code § 17-501 *et seq.* ...............................................................34

New York City Health Code Article 181.19...........................................................................*passim*

## Other Authorities

Brief of Appellants at 18, *Wooley v. Maynard*, 430 U.S. 705 (1977) (No. 75-1453) .................13

Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, 123 Stat.
    1776, 1845 (2009).....................................................................................................................8, 9

N.Y.C. Charter § 558 ....................................................................................................................31

N.Y.C. Dep't of Health & Mental Hygiene, *Tobacco Control*,
    www.nyc.gov/html/doh/html/smoke/ smoke2.shtml .........................................................11, 26

Anne Pearson, Senior Legal Counsel for Policy, Bureau of Tobacco Control, N.Y. City
Dep't of Health and Mental Hygiene, *Proposal to Require Health Warnings and
Smoking Cessation Information Where Tobacco is Sold* (June 24, 2009)...................5, 6, 7, 33

## INTRODUCTION

For decades, Congress has specified the content of federal warnings regarding the health risks of smoking, warnings that appear on every pack of cigarettes and in every cigarette advertisement.  This is so because Congress has determined that a unified, comprehensive warning system is appropriate.  The City of New York (the "City") apparently has concluded that the federal warnings are not good enough—that additional graphic signs at the point of sale are needed to keep people from smoking.  In the City's view, it is not enough to inform residents that "smoking causes lung cancer," as the federal warnings do.  Rather, according to the City, a Resolution is needed that forces retailers selling any tobacco products in the City to use their private property to display large signs containing graphic, color images of diseased or decayed organs and the directive, "Quit Smoking Today—Call 311 Or 1-866-NYQUITS."  *See* Resolution § 181.19.

The Resolution intrudes on Congress's exclusive power to determine the content of mandated warnings related to smoking and health, violates Plaintiffs' First Amendment and New York constitutional free speech rights, and represents an illegitimate foray into legislative policymaking by an administrative body.  This Court should preliminarily enjoin enforcement of Resolution § 181.19 because Plaintiffs are likely to succeed on the merits and would suffer irreparable harm if they were forced to carry the City's graphic anti-smoking message.  *See Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 573–74 (2d Cir. 2002); *Ecko.Complex LLC v. Bloomberg*, 382 F. Supp. 2d 627, 629 (S.D.N.Y. 2005) (Rakoff, J.) ("[T]he deprivation of a First Amendment right constitutes irreparable injury for purposes of a motion for preliminary injunction.").

In response to Plaintiffs' motion for a preliminary injunction, the City has moved, very prematurely, for summary judgment on all claims.  Given the state of this factual record, the City

plainly is not entitled to summary judgment on any claim, and certainly not without affording Plaintiffs the opportunity to conduct discovery.  Indeed, if any party is entitled to summary judgment, it is Plaintiffs:  There are no disputed genuine issues of material fact precluding this Court from holding that the Federal Cigarette Labeling and Advertising Act (the "Labeling Act") preempts the Resolution as a matter of law.  *See* 15 U.S.C. § 1331 *et seq.*; Fed. R. Civ. P. 56(c)(2); *see also Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp. of Am.*, 419 F.3d 181, 190 (2d Cir. 2005).  The City concedes that the Resolution is a "requirement" that is "based on smoking and health."  The City's only argument against preemption is that the Resolution is not "with respect to the advertising or promotion of any cigarettes," and yet it has acknowledged that the Resolution was intended to target advertising and promotion of cigarettes, and that it requires retailers displaying tobacco products to display the signs with the City's competing message.

While preemption alone is a sufficient basis to grant the preliminary injunction and to enter summary judgment for Plaintiffs (not the City), the Court should determine that strict scrutiny applies to the Resolution under the First Amendment and the New York Constitution's Free Speech Clause because the Resolution compels speech that is not purely factual and uncontroversial, and the City's defense cannot survive such scrutiny.  The City and its *amici* concede that the signs were designed to shock and call viewers to action.  The conclusion that the Resolution is subject to strict scrutiny is sufficient to grant Plaintiffs' motion for a preliminary injunction, because the City has made no credible attempt to meet that demanding standard, nor could it.  More than that, the City would not be entitled to summary judgment under any standard of First Amendment scrutiny—not under strict scrutiny, not under the standard for purely factual commercial disclosures articulated in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626,

651 (1985), and not under the standard generally applicable to commercial speech set out in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566 (1980). The City—not Plaintiffs—bears the burden of proving that the Resolution satisfies these standards.  *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000); *Ibanez v. Florida Dep't of Bus. & Prof'l Registration*, 512 U.S. 136, 146 (1994); *Bolger v. Youngs Drug Prods. Corp*., 463 U.S. 60, 71 n.20 (1983).  The City, however, offers no expert opinion supporting its position and entirely fails to satisfy its burden under any of these standards.[1] Plaintiffs, by contrast, submit expert declarations from Professors Reynolds and Viscusi demonstrating that the signs compelled by the Resolution will not be effective in reducing underage smoking and that many alternatives to the City's forced speech campaign exist that would not require compelling speech designed to shock.  On this record, Plaintiffs have demonstrated at least a likelihood of success under any First Amendment standard.  Accordingly, Plaintiffs' motion for a preliminary injunction should be granted, and the City's motion for summary judgment should be denied.[2]

---

[1]     An independent basis for denying the City's motion for summary judgment is the City's failure to come forward with any admissible proof of its scientific justification for the Resolution, as required by Federal Rule of Civil Procedure 56(e) (affidavits must "set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated"); *see also* Local Civil Rule 56.1 (requiring "citation to evidence which would be admissible").  The City offers no expert opinion supporting its position.  To the extent the City is relying on the tangentially related academic articles cited in the Farley Declaration or in the Memorandum of *Amici Curiae* in Opposition [Doc. 51] ("*Amici*"), the articles themselves plainly are inadmissible.

[2]     Plaintiffs incorporate by reference their Local Civil Rule 56.1 Counterstatement, filed concurrently with this brief.

I.        **The Labeling Act Preempts the Resolution.**

Through the Labeling Act, Congress "establish[ed] a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health."  15 U.S.C. § 1331; *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 546–53 (2001).  Accordingly, the statute provides that "[n]o statement relating to smoking and health, other than the statement required by [§] 1333 . . ., shall be required on any cigarette package" (15 U.S.C. § 1334(a)), and further that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter."  *Id.* § 1334(b).  The City concedes that the Resolution is a "requirement" that is "based on smoking and health."  Defendants' Memorandum of Law in Opposition [Doc. 47] ("Opp.") 31.  The only disputed issue is whether the Resolution is "with respect to the advertising or promotion" of cigarettes.  Plainly, it is.

Congress intended "with respect to" to be given broad effect.  In its original form, the Labeling Act provided that "[n]o statement relating to smoking and health shall be required *in the advertising* of any cigarettes the packages of which are labeled in conformity with the provisions of this Chapter."  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518 (1992) (plurality op.).  In 1969, Congress amended the statute to preempt requirements or prohibitions based on smoking and health "*with respect to* the advertising or promotion" of cigarettes.  The Supreme Court has held that the change from "in the advertising" to "with respect to the advertising or promotion" made the preemptive scope of the statute "much broader."  *Id.* at 520; *see also Vango Media, Inc. v. City of New York*, 34 F.3d 68, 72 (2d Cir. 1994) (holding that "with respect to" is similar to "relate to," a phrase that the Supreme Court has "given broad effect").

4

Here, the Resolution targets tobacco advertising and requires retailers to post the City's preferred anti-smoking messages with tobacco product displays, where manufacturers and retailers display product and point-of-sale advertising for cigarettes.  The Resolution mandates that retailers post graphic anti-smoking signs at each place where tobacco products are "displayed," or at every cash register.  Resolution § 181.19(c).  Moreover, the City candidly acknowledges that the signs are intended to correct what it judges to be deficiencies in the federal warnings scheme, asserting that "[t]he basic problem" with the existing federal warnings is "that they are unnoticed and stale, and they fail to convey info in an effective way," and that the Resolution is intended to "address these deficiencies."  Opp. 20–21 (internal citation and quotation marks omitted)); *see also, e.g., id.* at 1 ("Despite decades of warnings and other efforts to educate the public about the dangers of tobacco use, smoking remains the leading cause of preventable death in the United States and New York City.").  The City's competing message at the point of sale thus quite plainly "upset[s] federal legislative choices to require specific warnings . . . to address concerns about smoking and health."  *Reilly*, 533 U.S. at 551.

The mandated signs significantly affect cigarette advertising and promotion at the point of sale.  By requiring the placement of the graphic signs at every place where tobacco products are displayed, the Resolution necessarily directly impacts Plaintiffs' advertising and promotion at the point of sale—customers approaching a tobacco product display see both the point-of-sale advertising incorporated into the display and the City's graphic signs encouraging them not to buy those very products.  The City does not contest the fact that the graphic signs are intended to "[c]ounteract tobacco advertising."  Anne Pearson, Senior Legal Counsel for Policy, Bureau of Tobacco Control, N.Y. City Dep't of Health and Mental Hygiene, *Proposal to Require Health Warnings and Smoking Cessation Information Where Tobacco is Sold* (June 24, 2009) ("Pearson

5

Proposal") (Exh. C. to Declaration of Jennifer H. Rearden, dated June 25, 2010); *see* Opp. 31 (acknowledging that the Labeling Act "'preempts state regulations targeting cigarette advertising'" (quoting *Reilly*, 533 U.S. at 550)).

Consistent with that stated purpose, the mandated signs interfere with cigarette advertising and promotion far more directly than the signs the Second Circuit held were preempted in *Vango Media*. There, the New York City law required freestanding anti-smoking messages on taxicabs. *See Vango Media*, 34 F.3d at 70 (law required minimum of one public health message pertaining to the dangers of smoking for every four tobacco advertisements). As the *Vango Media* court expressly recognized, "actual cigarette advertisements would not look different" if the law were upheld—the mandated anti-smoking messages did not directly interfere with tobacco advertising *at all*. The court nevertheless concluded that the Labeling Act preempted the law because "advertisers and promoters like Vango would be substantially impacted by the Local Law's requirements." 34 F.3d at 74; *see also id.* at 75 (holding that the ordinance was "with respect to" the advertising or promotion of cigarettes because it "impose[d] conditions on [advertisers' and promoters'] display of cigarette advertisements"). *See also Reilly*, 533 U.S. at 550–51 (the Labeling Act prohibits "state cigarette advertising regulations . . . motivated by concerns about smoking and health").

Unlike the law in *Vango Media*, which required the display of standalone anti-smoking signs, the Resolution requires retailers to permanently post the graphic anti-smoking signs side-by-side with each tobacco product display or at every cash register surrounding such a display. These tobacco product displays, almost without exception, include point-of-sale advertising. This interference with the federally-mandated warnings scheme is much more direct than with

the preempted law in *Vango Media*—a law that, by the City's characterization, "touched upon the area of tobacco advertising only at its edges." Opp. 33.

The City has no answer for *Vango Media*. It tries to distinguish the case on the ground that, under the law in *Vango Media*, "an advertiser or promoter could not display cigarette advertisements without also displaying the anti-smoking messages," whereas here "retailers and tobacco companies remain free to advertise and promote tobacco products notwithstanding the Resolution." Opp. 33. That is no distinction at all, as it was equally true in *Vango Media*. The law in *Vango Media* substantially affected advertisers and promoters *because* the mandated warnings were tethered to tobacco advertisements, not because the law was denominated an "advertising" regulation. *See* 34 F.3d at 74.

The City's attempt to characterize the Resolution as a "sales" regulation and not an advertising regulation (*e.g.,* Opp. 35) completely ignores both the intent and the effects of the mandated signs and, in any event, finds no support in the case law. From the beginning of the administrative process leading to the Resolution, the City has stated that the purpose of the Resolution is to "[c]ounteract tobacco advertising." *See* Pearson Proposal. In its brief, the City continues to assert that the signs will "combat the tobacco companies'" messages. Opp. 22. The City also states in the proposal that "[t]obacco advertising [is] prominent in most stores," but that "[c]urrently, [there is] no point-of-sale health information." This statement is patently inaccurate—the federally-mandated warnings appear on cigarette advertisements and cigarette packages, as required by the Labeling Act. More importantly, however, this statement vividly demonstrates the City's belief that the federal scheme simply does not do enough "with respect to" Plaintiffs' advertising. Congress set the balance on mandated health warnings. It is not for the City to second-guess Congress's decision.

The City tries to divert attention from its admission that the Resolution was designed to "[c]ounteract tobacco advertising" by accusing Plaintiffs of taking a "hyper-literal approach" to the Labeling Act's preemption clause.  *See* Opp. 35 (quoting *Greater New York Metro. Food Council, Inc. v. Giuliani*, 195 F.3d 100, 105 (2d Cir. 1999), and comparing this case to that one even though *Greater New York Metro.* has been abrogated in part by *Reilly*, 533 U.S. at 525)). This is not a case of a generally applicable regulation that has only an "evanescent" relationship to cigarette advertising and promotion.  *Greater N.Y. Metro. Food Council*, 195 F.3d at 105.  To the contrary, the City built the Resolution from the ground up to combat tobacco manufacturers' and retailers' efforts to advertise their lawful products.  *See Rockwood v. City of Burlington*, 21 F. Supp. 2d 411, 418 (D. Vt. 1998) (accepting as evidence that a city ordinance was based on smoking and health videotapes and transcripts of the Burlington City Council meetings).  The City's admission speaks for itself.  The Labeling Act's preemption provision would be a thin reed if it barred only state and local laws that were expressly designated "advertising" regulations and did not reach regulations that in fact have a substantial, intended, and direct effect on cigarette advertising, as does the Resolution.

The recent amendments to the Labeling Act in the Family Smoking Prevention and Tobacco Control Act ("FSPTCA"), Pub. L. No. 111-31, 123 Stat. 1776 (2009), confirm this conclusion.  As Plaintiffs explained in their opening brief, the FSPTCA created an exception to the Labeling Act's preemption provision for *time, place, and manner* regulations of cigarette advertising and promotion (*see* 15 U.S.C. § 1334(c)), but the statute expressly bars states from enacting content-based regulations with respect to the advertising or promotion of cigarettes.  *Id.* The Resolution, of course, is a content-based regulation:  It dictates the "text, images and content" of the required signs and requires the City's anti-smoking message to be placed at

tobacco product displays.  Resolution § 181.19(d).  The FSPTCA also requires the FDA to promulgate regulations "that require color graphics depicting the negative health consequences of smoking to accompany the label statements specified in [the Labeling Act]."  15 U.S.C. § 1333(d).  Thus, the Resolution not only invades Congress's province, but also collides head on with a specific congressional requirement.  *See* Declaration of Thomas A. Farley, M.D., M.P.H. ¶ 28 ("Farley Decl.") ("The enhanced [federal] warnings on cigarette packs will not be implemented for several years and even then, it is possible that they will be displayed in such a way that consumers will only see them after they have made their purchases.").  Congress designed the Labeling Act's preemption provision to avoid such a patchwork of state and federal laws requiring competing smoking-and-health messages, and has authorized FDA to conduct rulemaking to determine what graphic cigarette warnings should look like and say.  FSPTCA § 201, 123 Stat. at 1845.

The cases cited by the City are not to the contrary.  In *Rockwood v. City of Burlington*, the district court—citing the "broad language of 'with respect to the advertising or promotion of cigarettes'"—struck down provisions of a city ordinance that prohibited the use of color and imagery in tobacco advertisements and the use or distribution of promotional items because those "measures impose[d] conditions on the display of tobacco advertisements" and "directly affect[ed] the advertisement and promotion of cigarettes."  21 F. Supp. 2d at 420.   And in upholding a ban on self-service displays, the court reasoned that the ban restricted "access to or availability of tobacco products," much like "prohibitions on the sale of tobacco to minors, or on smoking in public places," and in contrast to "measures which attempt to affect the desire for cigarettes by regulating tobacco advertising."  *Id.*  Here, the Resolution does not at all address "access to or availability of tobacco products," but instead is designed to "affect the desire for

cigarettes by regulating tobacco advertising." *Id.*; *see* Resolution, Statement of Basis and Purpose ("By highlighting the undesirability and unacceptability of tobacco use, health warning signs will be consistent with other Department efforts to prevent youth smoking initiation and will further de-normalize smoking."). Consequently, *Rockwood* supports Plaintiffs' position, not the City's.

The same is true of *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58 (1st Cir. 1997). There, a Massachusetts law required tobacco product manufacturers to provide the Massachusetts Department of Public Health with a yearly report regarding all their tobacco products, listing the additives and nicotine yields of each product. *See id.* at 62. The court held that the Labeling Act did not preempt the law because, unlike in *Vango Media*, where there was a "direct and substantial connection between the ordinance and industry advertising," the Massachusetts law did not "impose conditions upon tobacco advertising or promotional decisions, which are irrelevant to the Disclosure Act's obligations." *Id.* at 74. The great distance between the law in *Harshbarger* and the Resolution is obvious: Unlike a requirement that tobacco manufacturers disclose information to a government agency, there obviously is a "direct and substantial connection" between forcing retailers to post graphic anti-smoking signs at the point of sale and Plaintiffs' advertisements.

Finally, the City makes a parade-of-horribles plea when it suggests that Plaintiffs' preemption argument "would invalidate virtually all efforts to prevent and reduce tobacco use." Opp. 31. That hyperbolic assertion is not even remotely true. In addition to the federal government's required warnings, the City retains broad authority to inform its citizens about the negative health effects of smoking, including, for example, by disseminating its message on public property or through purchasing its own channels of communication. Indeed, the City

already does so.  *See, e.g.,* N.Y.C. Dep't of Health & Mental Hygiene, *Tobacco Control,* www.nyc.gov/html/doh/html/smoke/smoke2.shtml (stating that "[t]o counter [tobacco] industry marketing, the Department utilizes media campaigns to better educate New Yorkers on the dangers of smoking and secondhand smoke as well as resources to help them quit.") ("*Tobacco Control*") (last visited September 20, 2010).  But the City cannot *require* retailers to post additional messages related to smoking and health alongside cigarette advertisements.  *See Altria Group, Inc. v. Good*, 129 S. Ct. 538, 544 (2008).  That, however, is precisely what the Resolution does.

As the Supreme Court recently explained:

> Together, the labeling requirement and pre-emption provisions express Congress' determination that the prescribed federal warnings are both necessary and sufficient to achieve its purpose of informing the public of the health consequences of smoking.  Because Congress has decided that no additional warning statement is needed to attain that goal, States may not impede commerce in cigarettes by enforcing rules that are based on an assumption that the federal warnings are inadequate.

*Id.* at 544.  The Resolution represents the City's judgment that "the federal warnings are inadequate" (*id.*)—that additional, more shocking measures are needed to get smokers to quit.  Only Congress possesses authority to make that judgment.  Because the Board encroached on Congress's exclusive authority to establish the content of "cigarette labeling and advertising with respect to any relationship between smoking and health" (15 U.S.C. § 1331), the Resolution is preempted.

## II.     The Resolution Violates the First Amendment and the Free Speech Clause of the New York Constitution.

Plaintiffs' motion for a preliminary injunction should be granted for the additional reason that the Resolution violates the First Amendment and the Free Speech Clause of the New York Constitution because it forces Plaintiffs to carry the Board's controversial images and non-

factual directive, "Quit Smoking Today—Call 311 Or 1-866-NYQUITS," and compromises their ability to communicate freely and effectively about lawful products with adult consumers.  The First Amendment guarantees "both the right to speak freely and the right to refrain from speaking at all" (*Wooley v. Maynard*, 430 U.S. 705, 714 (1977)), and Supreme Court precedent makes clear that it is unconstitutional for the government to force a private entity to carry, on its private property, a non-factual message not of his own choosing.  *See, e.g.*, *id.* at 715 (holding that it was unconstitutional compelled speech to either "require[] that [private individuals] use their private property as a 'mobile billboard' for the State's ideological message or suffer a penalty").  But for the Resolution, the Retailer Plaintiffs and members of the Trade Association Plaintiffs would not place the City's shocking images and non-factual directive in their stores.  Yet, not surprisingly, customers already attribute the City's anti-smoking message to some of the Retailer Plaintiffs themselves.  *See, e.g.*, Affidavit of Manny Infante, dated May 28, 2010 ("Infante Aff.") ¶ 13.  Because the Resolution compels Plaintiffs to carry the City's graphic advocacy and call to action, it violates the First Amendment and New York's Free Speech Clause and must be set aside.

### A.      The Mandated Signs Are Not Government Speech.

When the government compels a private entity to carry the government's message on its private property, the First Amendment standard is binary:  Either the compelled speech is purely factual and uncontroversial and directed at preventing consumer deception, in which case the standard for compelled commercial disclosures articulated in *Zauderer* applies, or it is not and therefore subject to strict scrutiny (*see Wooley*, 430 U.S. at 714).  It is *never* government speech, contrary to the City's primary argument.  *See* Opp. 3–9.

It is true that, when the government is the speaker, it may choose what to say and what not to say. *See Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1131 (2009). But for speech to be government speech, it must occur on or through *government property*—a fact that the City does not even acknowledge in its brief. *See id.* at 1129 ("the placement of a permanent monument in a *public park* is best viewed as a form of government speech" (emphasis added)); *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 562–65 (2005) (holding that the First Amendment does not apply to tax assessments—government property—that are used to fund government speech so long as the speech is not reasonably attributable to any particular taxpayers). Thus, the City is free to post graphic anti-smoking signs on its own property, or it may even purchase advertising space (just as any private speaker would) to use for expressing its own views. It cannot, however, compel a private entity to use its *private property* to carry the City's message.

In this regard, the Supreme Court's controlling decision in *Wooley* is directly on point. There, the Maynards, New Hampshire residents, sought to enjoin the State from prosecuting them for refusing to display the state motto—"Live Free or Die"—on their vehicle license plates, a motto with which they disagreed. 430 U.S. at 709. In defending the law, the State argued that there was no risk that the motto would be attributed to the Maynards because it was common knowledge that the State designed and required the license plates. Brief of Appellants at 18, *Wooley v. Maynard*, 430 U.S. 705 (1977) (No. 75-1453). Indeed, the license plate was created and distributed by the "State of New Hampshire"—it bore those very words. *Compare* Opp. 5 (arguing that the placement of the Health Department's logo in the corner of the mandated signs converts the signs to government speech). The Supreme Court rejected the State's argument, holding that it was unconstitutional compelled speech to "require[] that [private individuals] use

13

their private property as a 'mobile billboard' for the State's ideological message or suffer a penalty."  *Wooley*, 430 U.S. at 715.  As this makes clear, when the government requires its citizens to act as conduits for its message, the speech is no longer government speech shielded from First Amendment scrutiny, but *compelled* speech subject to the highest level of scrutiny available under the First Amendment.  Notably, *in dissent*, Justice Rehnquist argued essentially the City's case today—that the State's license plate requirement did not compel the Maynards to "'say' anything," much less compel them actually or even apparently to affirm their agreement with the State motto—but the majority disagreed.  *Id.* at 720 (Rehnquist, J., dissenting); *cf. Caruso v. Yamhill Cnty.*, 422 F.3d 848, 858 (9th Cir. 2005) (rejecting First Amendment challenge to statute requiring the inclusion of certain information on a voter ballot because "unlike . . . [in] *Wooley*, [the statute did] not require that owners use their private property to transmit the State's message").

*Wooley* controls.  Just as in that case, the Resolution forces Plaintiffs to use their private property as a "billboard" for the City's message—a message that they otherwise would not choose to carry in their stores or advertisements.  Consequently, the signs are not government speech.

The Supreme Court's decision in *Johanns* (Opp. 5) is not to the contrary.  There, the Court addressed whether generic advertising for beef products paid for by mandatory tax assessments was the government's own speech and thus exempt from First Amendment scrutiny.  No private individual was forced to carry the advertising on his private property—the government used money collected from producers to buy advertising space from vendors.  *Johanns* therefore did not address compelled *speech*, but rather, compelled *subsidies*.  And as the Court explicitly held, this distinction was critical:  A government compelled subsidy of the

government's own speech is not a "true compelled-speech case[] in which an individual is obliged personally to express a message he disagrees with imposed by the government." *Johanns*, 544 U.S. at 557 (internal quotation marks omitted); *see also id.* at 565 n.8 ("But this compelled speech argument (like the *Wooley* and [*West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943)] opinions on which it draws) differs substantively from the compelled-subsidy analysis.").  Here, in contrast, the Resolution involves classic compelled speech indistinguishable from the license plates at issue in *Wooley*.[3]

Similarly inapposite is *R.J. Reynolds Tobacco Co. v. Shewry,* 423 F.3d 906 (9th Cir. 2005), another compelled-subsidy case.  *See* Opp. 5, 8.  There, tobacco manufacturers challenged a regulatory regime under which the State of California taxed tobacco companies and then used those funds to pay for the State's own media campaign attacking the tobacco industry.  423 F.3d at 911.  Concluding that the speech in question was government speech, the Ninth Circuit held that *Wooley* and *Barnette* were "not directly applicable" because "there [was] no claim that *the tobacco companies have been forced into expressing any position*."  *Id.* at 915 (emphasis added).  Had the State mandated that the tobacco companies carry its anti-tobacco messages on their

---

[3]   The City also tries to distinguish *Wooley* by arguing that, unlike in *Wooley*, the mandated signs "do not contain an ideological message."  Opp. 17.  Putting aside the City's cramped understanding of "ideology," "[i]n general, First Amendment protection does not hinge on the ideological nature of the speech involved," and "the First Amendment's proscription of compelled speech does not turn on the ideological content of the message that the speaker is being forced to carry."  *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004).  "The constitutional harm—and what the First Amendment prohibits—is being forced to speak rather than to remain silent."  *Id.* (citing *Wooley*, 430 U.S. at 714).

private property, *Wooley* would have controlled and the outcome clearly would have been different.[4]

The City's government-speech argument does accomplish one thing in this case:   It establishes the City's own acknowledgement that the mandated signs are neither purely factual nor uncontroversial.  The City concedes that the Resolution expresses the City's own "message." *See* Opp. 5, 8.  As Plaintiffs explained in their opening brief and reiterate below, the Resolution fails First Amendment scrutiny precisely because it forces Plaintiffs to carry a message not of their own choosing.[5]

**B.    Strict Scrutiny Applies To The City's Forced Speech Campaign.**

The Resolution forces the Retailer Plaintiffs and members of the Trade Association Plaintiffs to post, on their private property, and Manufacturer Plaintiffs to append to their point-

---

[4]    The other cases cited by the City are even further off the mark.  *See* Opp. 5–8.  In *Arizona Life Coalition Inc. v Stanton*, 515 F.3d 956 (9th Cir.), *cert. denied sub nom.*, *Stanton v. Arizona Life Coalition*, 129 S. Ct. 56 (2008), the Ninth Circuit applied *Johanns* to a vanity license plate program to determine whether the State had created a limited public forum—the case did not address issues of compelled speech.  *Id.* at 964–65.  Likewise, in *Grosjean v. Bommarito*, 302 F. App'x 430 (6th Cir. 2008) (unpublished), the Sixth Circuit applied *Johanns* to determine whether biographical entries in a *state-generated* listing of unemployment advocates constituted government speech—the case had nothing at all to do with compelling private parties to use their property to carry a government message.  *Id.*

[5]    *Amici*'s suggestion that this case is controlled by the Supreme Court's decision in *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), is confusing, to say the least.  *Amici* at 15.  The question in *PruneYard* was whether California state constitutional protections permitting *private* individuals to exercise free speech and petition rights on the property of a privately owned shopping center violated the First Amendment.  *Id.* at 78.   The Court specifically noted that it was not a case where the government *itself* had forced a private party to carry a particular message.  *Id.* at 87–88.    In his opinion concurring in the judgment, Justice Powell stated that he did "not believe that the result in *Wooley v. Maynard* . . . would have changed had the State of New Hampshire directed its citizens to place the slogan 'Live Free or Die' in their shop windows rather than on their automobiles."  *Id.* at 97 (Powell, J., concurring in part and in the judgment).

of-sale displays, the Board's directive to "Quit Smoking Today," along with images of decayed teeth, cancerous lungs, and damaged brains.  These are words and images that Plaintiffs would not choose to post on their own.  *See* Infante Aff. ¶ 18; Affidavit of Frank Cala, dated May 27, 2010 ("Cala Aff.") ¶ 11; Affidavit of Ralph Bombardiere, dated May 25, 2010 ("Bombardiere Aff.") ¶ 5; Affidavit of James Calvin, dated May 19, 2010 ("Calvin Aff.") ¶ 7, 10; Declaration of Victor D. Lindsley, dated May 27, 2010 ¶ 5; Declaration of William F. Gifford, dated June 2, 2010 ¶ 5; Declaration of Robert H. Dunham, dated June 1, 2010 ¶ 6.  Because the Resolution compels speech that Plaintiffs otherwise would not make, it is content-based (*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)), and therefore "presumptively invalid" (*R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)) and subject to strict scrutiny. *Playboy Entm't Group*, 529 U.S. at 813.

Although the City argues to the contrary (*see* Opp. 24–25), the Resolution cannot possibly satisfy strict scrutiny.  *See Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984) ("Only rarely are statutes sustained in the face of strict scrutiny. . . . [S]trict-scrutiny review is strict in theory but usually fatal in fact." (internal quotation marks omitted)).  Nor is the City correct that the Resolution should be evaluated under the relaxed *Zauderer* standard instead of strict scrutiny. *See* Opp. 13.  To the contrary, the mandated signs are not limited to "purely factual, non-controversial" elements:  *Zauderer* and the cases in which it has been applied confirm that the mandated signs fall well outside that narrow exception to strict scrutiny.

*Zauderer* excepts from strict scrutiny the compelled disclosure of "purely factual and uncontroversial information" so long as it is "reasonably related to the State's interest in preventing deception of consumers."  *Zauderer*, 471 U.S. at 651; *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1339–41 (2010).  If those requirements are met,

then the disclosure requirement will be upheld if it is not "unjustified or unduly burdensome." *Zauderer*, 471 U.S. at 651.[6]

As an initial matter, there is nothing misleading about the sale of cigarettes—and the City does not contend otherwise. Cigarette advertising and packages display federal health warnings that the Supreme Court has held are "sufficient to achieve [Congress's] purpose of informing the public of the health consequences of smoking." *Good*, 129 S. Ct. at 544. This alone takes the mandated signs outside *Zauderer*'s exception.

More importantly, as the City concedes (Opp. 13), *Zauderer* applies only to the compelled disclosure of "*purely* factual and uncontroversial information." *Zauderer*, 471 U.S. at 651 (emphasis added). In *Zauderer*, for instance, the Court upheld a rule of professional conduct that required attorneys who advertised contingency-fee services to disclose in their advertisements that a losing client might still be responsible for certain litigation fees and costs. *Id.* Likewise, in *Milavetz*, the Court upheld a law requiring law firms to disclose whether they functioned as a debt relief agency because the disclosure "entail[ed] *only* an accurate statement identifying the advertiser's legal status and the character of the assistance provided." *Milavetz*, 130 S. Ct. at 1339–40 (emphasis added). *New York Restaurant Ass'n v. New York City Board of*

---

[6]   By its terms, the *Zauderer* exception applies only to the compelled disclosure of purely factual and uncontroversial information that is aimed at preventing *consumer deception*. *See Zauderer*, 471 U.S. at 651. Nevertheless, as the City points out, in *National Electric Manufacturers Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001), the Second Circuit held that a compelled disclosure need not be aimed at preventing consumer deception to come within the *Zauderer* exception. *Id.* at 115.

The Supreme Court's recent decision in *Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324 (2010), makes clear, however, that *Zauderer* applies only to the compelled disclosure of purely factual and uncontroversial information that is "reasonably related to the State's interest in preventing deception of consumers." *Id.* at 1340 (quoting *Zauderer*, 471 U.S. at 651).

*Health*, 556 F.3d 114, 121 (2d Cir. 2009), involved a New York City law requiring restaurants to publish calorie information (*i.e.*, "the taco salad contains 840 calories"), and both *Environmental Defense Center, Inc. v. EPA*, 344 F.3d 832, 850 (9th Cir. 2003), and *National Electric Manufacturers Ass'n v. Sorrell*, 272 F.3d 104, 113–14 (2d Cir. 2001), upheld compelled disclosures of purely factual descriptions about how properly to dispose of toxic products.

The City's signs, by contrast, do not present uncontroversial facts.  They are designed to shock consumers into not purchasing a legal product through the use of graphic images and by directly urging consumers to "Quit Smoking Today."   Indeed, the City and its *amici* concede that, far from providing purely factual and uncontroversial information, the signs represent a "direct 'call to action'" (Memorandum of *Amici Curiae* in Opposition [Doc. 51] ("*Amici*") at 3) and "are designed to shock" and "to produce a strong visceral reaction."  Opp. 22; *see also Amici* at 1 (signs "call[] on potential consumers of tobacco products to quit smoking immediately"); *id.* at 14 (signs "exhort[] consumers to 'take action.'").[7]  To the extent that this effort to shock rather than to inform is not apparent from the face of the signs or from the City's own acknowledgement, Professor Reynolds draws on his experience as a behavioral psychologist and Professor Viscusi draws on his decades of experience as a government warnings expert to confirm that the signs shock and play on the emotions rather than inform.  *See* Declaration of Dr. Cecil R. Reynolds ("Reynolds Decl.") ¶ 57 ("In my professional judgment, the signs do not

---

[7]    *Amici* contend that the call to action in the mandated signs is not constitutionally significant because numerous other statutes encourage specific consumer behavior without violating the First Amendment.  *Amici* at 14.  But the examples offered by *amici*—*e.g.*, safety warnings about latex balloons potentially being a choking hazard for children and the use of the skull-and-crossbones sign on certain insecticides—are fundamentally different in that they only include factual instructions to avoid *misuse* of the product in question.  The signs here, by contrast, convey the City's message that customers should not purchase Plaintiffs' products at all.

appear designed to inform or to educate, but instead to scare the viewer into not smoking by creating a negative emotional reaction to the signs."); Declaration of W. Kip Viscusi ("Viscusi Decl.") ¶ 56 ("[The signs'] intent is not to inform but to generate fear and disgust for a product for which consumers already have a fully adequate appreciation of the risk."); *id.* ¶ 69 ("[T]he graphic warnings are a form of advocacy that is intended to cause shock and to discourage people from purchasing cigarettes.  The images of tooth decay, lung cancer and stroke are emotionally charged pictures that are apparently intended to engender feelings of disgust with respect to the purchase of cigarettes.  They are controversial by design.").  Dr. Farley agrees.  *See* Farley Decl. ¶ 12 ("Smokers report negative emotional responses to graphic warnings . . . .").

The City argues that the statement "Quit Smoking Today—Call 311 Or 1-866-NYQUITS" simply informs smokers that they may die if they do not quit smoking and makes smokers aware of cessation resources, but that *post hoc* justification cannot be squared with the words themselves, phrased in the imperative, directing consumers to take action today to stop purchasing a lawful product.  *See* Viscusi Decl. ¶ 71 ("In effect, the sign does not simply provide information in a neutral manner but tells people that they should not purchase the product and that they should quit smoking by calling the quit line."); *see generally id.* ¶¶ 67–69, 71.

Equally unpersuasive is the City's contention that the graphic images are purely uncontroversial and factual.  *See* Opp. 13 ("If a photo is not doctored, there is no issue of truth with respect to it.").  The City's position erroneously presumes that any message that is not false is factual.  But many messages are neither factual nor false.  The City's position would justify the use of any non-doctored photograph, regardless of the message it conveys.  Moreover, a seemingly "factual" picture obviously can be used in a way that conveys a "subjective" message, and that is particularly true where, as here, the purported "factual" content already is universally

known (and indeed, overestimated).  *See* Viscusi Decl. ¶¶ 19, 35–43 (explaining that more people know the health risks of tobacco use than know that the Earth revolves around the Sun and that, in fact, individuals overestimate the risks of tobacco use); *id.* ¶¶ 27–28 (analyzing survey evidence and concluding that "information about the risks of tobacco has been disseminated to and absorbed by an overwhelmingly high percentage of the population"); *id.* ¶¶ 35–43 (analyzing scientific studies on the perceived risks of tobacco-related diseases and concluding that the public "substantially overestimates the associated risks"); *Barnette*, 319 U.S. at 632–33 ("A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn.").  For example, animal rights activists use shocking "factual" images of mutilated animals to deliver their passionate policy advocacy against animal abuse.  Here, the City has trumpeted the reality that its signs "are designed to shock" and "to produce a strong visceral reaction" in precisely the same way.  Opp. 22; *see also Amici* at 1 (signs "call[] on potential consumers of tobacco products to quit smoking immediately"); *id.* at 14 (signs "exhort[] consumers to 'take action.'"); *see also* Farley Decl. ¶ 12 (the images are designed to provoke in the viewer a "negative emotional response[]").

By the City's reasoning, there is no limit to the shocking, factually "true" signs regarding otherwise legal activities that it could require private speakers to post.  It could force fast food restaurants to post signs containing images of clogged arteries and diseased hearts and loudly proclaiming:  "Quit Eating Fast Food Today."  It could force butchers to post graphic signs of pigs and cattle being slaughtered, along with the message "Save a Life—Go Vegetarian Today."  It could, in short, impose its policy preferences on all types of industries and advertising.  If the City wants to deliver such a message, it is free to do so in its own voice and on its own property.

21

But the First Amendment bars the City from commandeering Plaintiffs as a mouthpiece for its anti-smoking campaign.

That is precisely why courts consistently have rejected laws like the Resolution that attempt to force private speakers to carry non-factual information or the government's advocacy in the manner or at the volume of the government's choosing. *See, e.g.*, *Wooley*, 430 U.S. at 714; *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 15 n.12 (1986); *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006). The City tries to distinguish *Entertainment Software* on the ground that the Illinois law there involved the State's "subjective" judgment that certain video games were sexually explicit, whereas the mandated signs are "based on proven medical facts." Opp. 15. Again, the City misses the point: The graphic images and call to action contained in the City's signs express the City's viewpoint ("Quit Smoking Today") even more explicitly than the far subtler message embedded in Illinois's description of certain video games as sexually explicit. *Cf. Entm't Software*, 469 F.3d at 652–53.

Smoking carries with it certain health risks (*see* Opening Br. 21–22), but the mandated signs go far beyond describing those risks in purely factual, uncontroversial terms: They urge consumers not to purchase Plaintiffs' *legal* cigarette products, and they do so in a manner designed to shock consumers into acting as the City believes is in their best interests. For this reason, strict scrutiny applies.

### C.   The Resolution Fails Strict Scrutiny.

As Plaintiffs explained in their moving papers, strict scrutiny is the "most rigorous and exacting standard of constitutional review." *Miller v. Johnson*, 515 U.S. 900, 920 (1995); *see also Bernal*, 467 U.S. at 219 n.6 ("[S]trict-scrutiny review is strict in theory but usually fatal in fact." (internal quotation marks omitted)). The standard is even more exacting when the

government tries to compel private speech.  "It would seem that involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence."  *Barnette*, 319 U.S. at 633.  That strict scrutiny applies at all establishes Plaintiffs' likelihood of success on the merits.  *See Firecross Ministries v. Municipality of Ponce*, 204 F. Supp. 2d 244, 250 (D.P.R. 2002) ("Because regulations subject to strict scrutiny almost never survive that analysis, Plaintiffs have thus shown a likelihood of success on the merits.").

Under strict scrutiny, the City bears the burden of showing that the Resolution is narrowly tailored to serve a compelling government interest.  *Playboy Entm't Group*, 529 U.S. at 816–17.  If the City could achieve its interest through an alternative that is non-restrictive or less restrictive of speech, then it *must* do so.  *See id.* at 813 ("If a less restrictive alternative would serve the Government's purpose, the legislature *must* use that alternative." (emphasis added)). The Resolution fails strict scrutiny because the City has provided no credible, empirical evidence demonstrating that the mandated signs will curb youth smoking—the only possible compelling interest in the case—nor has it provided any credible evidence that that there are not less speech-restrictive means for accomplishing its stated goals for the Resolution.  Even if there were a compelling interest in affecting the permitted use of a legal product by adults, the City has done no better on that score.  In fact, numerous less speech-restrictive alternatives are available to the City that would not compel Plaintiffs to carry the City's shocking graphics and "quit smoking" directive.  *See Eclipse Enters., Inc. v. Gulotta*, 134 F.3d 63, 67 (2d Cir. 1997) (striking down law under strict scrutiny for lack of credible, empirical evidence of the law's effectiveness and rejecting county's argument that it had "the right to enact the law based upon 'experience, knowledge, and common sense'").  Accordingly, the Resolution violates the First Amendment

and New York constitutional free speech rights.  *See Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 249, 567 N.E.2d 1270, 1277–78 (1991).

### 1.    The City does not have a compelling interest in controlling adult behavior.

In support of the Resolution, the City asserts two separate interests as compelling: (1) reducing *youth* smoking, and (2) reducing smoking among the entire population, including among *adults*.  Opp. 24; Farley Decl. ¶ 3.  Although the City may have a compelling interest in preventing underage tobacco use (*see Reilly*, 533 U.S. at 564), it has no constitutionally compelling interest in dissuading adults from purchasing a legal product.  *See id.* at 571 ("[S]o long as the sale and use of tobacco is lawful for adults, the tobacco industry has a protected interest in communicating information about its products and adult customers have an interest in receiving that information.").

Indeed, the Supreme Court has rejected time and again the notion that the government has a compelling interest in preventing adults from engaging in otherwise legal conduct.  *See, e.g.*, *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (plurality op.) (invalidating a state law prohibiting the advertisement of liquor prices that was motivated by the state's asserted interest in reducing alcohol consumption).  The Court has described such reasoning as "paternalistic" and has held that it cannot withstand constitutional scrutiny.  *See, e.g.*, *44 Liquormart*, 517 U.S. at 503, 510. Thus, if the City wants to decrease the incidence of otherwise legal adult behavior, it must do so without restricting or compelling speech.  *See id.*

### 2.    The Resolution is not narrowly tailored.

The City cannot show that forcing private parties to carry graphic anti-smoking signs at the point of sale is even remotely (let alone narrowly) tailored to the prevention of underage

smoking—the only potential compelling interest that the City has asserted in this case.  The City could have furthered its interest in preventing underage smoking through numerous alternatives that are non-restrictive or less restrictive of speech.  *See Playboy Entm't Group*, 529 U.S. at 813 ("If a less restrictive alternative would serve the Government's purpose, the legislature *must* use that alternative." (emphasis added)).

As an initial matter, the City's argument with respect to youth falls of its own weight.  The City argues that it must place the mandated signs at the point of sale—as opposed to at bus stops, on billboards, or in newspaper ads—to stop the "impulse" purchase, to reach consumers when they are most focused on cigarette use.  But, as the City as much as concedes, this is at best an argument for *adults*.  *See* Farley Decl. ¶¶ 13, 25.  It is illegal for persons under the age of eighteen to purchase any tobacco product at the retail locations to which the Resolution applies. Reynolds Decl. ¶ 65 (opining that the City's argument that the mandated signs will curb underage purchases of cigarettes at the point of sale is "unsupported by reference to reliable scientific evidence" and noting that "the majority of New York youth do not obtain tobacco products in retail establishments").  The driving justification for the Resolution does not (indeed cannot) apply to youth at all, much less in any tailored way.

Moreover, the City could have furthered its interest in curbing youth smoking (or its professed interest in curbing adult smoking as well) through numerous alternatives that do not trample on Plaintiffs' free speech rights.  The City is free, for instance, to press its message— even using images of diseased body parts and urging consumers not to purchase Plaintiffs' products—*on public property (including at public schools) or through other channels of communication that the City chooses to purchase. See Riley*, 487 U.S. at 800 (noting that North Carolina could "itself publish the detailed financial disclosure forms it requires professional

fundraisers to file").  The Board already does so with respect to messages regarding smoking and health.  *See, e.g., Tobacco Control*, www.nyc.gov/html/doh/html/smoke/smoke2.shtml (listing "Public Education" as part of the City's Five-Point Tobacco Control Plan).  And the City has implemented all sorts of additional measures unrelated to speech.  It has imposed new taxes on tobacco, increased penalties for sales to minors, and banned the use of tobacco in restaurants, bars, and other public places.  *See id.* (listing taxation, legal action, cessation, and evaluation and monitoring as remaining parts of the City's Five-Point Tobacco Control Plan).  The City has concluded that "raising the price of cigarettes through tax is one of the most effective ways to discourage tobacco use" (*see id.*) and currently is considering a proposed law that would raise the legal age to purchase tobacco products to 19 (*see* Proposed Bill Int. 0250-2010 (introduced May 25, 2010)).  *See also* Reynolds Decl. ¶ 77(a).  The City provides no explanation for why these methods could not be employed or reinforced to even greater effect.  *See, e.g.*, *Entm't Software*, 469 F.3d at 652 ("[T]he State has not demonstrated that it could not accomplish this goal [of preventing the sale of violent or sexually explicit video games to minors] with a broader educational campaign about the [video game rating] system." (citing *Riley*, 487 U.S. at 800)).

Smoking rates among the City's residents have consistently declined since 2002 without resort to the infringements on free speech imposed by the Resolution.  *See* Farley Decl. ¶ 7; *see also* Reynolds Decl. ¶ 77 (opining that numerous alternatives to shocking signs are "likely to be successful because they correctly focus on the interpersonal factors that are strongly associated with, and that distinguish between, youths who use tobacco and those who do not").  In this environment, the City cannot show that it is using means least violative of First Amendment rights.  Of course, purchasing advertising space is more expensive than forcing private persons to carry the City's message, but no court applying strict scrutiny has sacrificed constitutional values

to put a government's balance sheet in better standing.  *See Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974) (holding under strict scrutiny review that "[t]he conservation of the taxpayers' purse" is not a compelling interest).

Nor is the Resolution narrowly tailored to any constitutionally relevant interest in affecting the permitted use of a legal product by adults.  *But see* Section II.C.1 *supra* (demonstrating that such interests are not compelling in the constitutional sense).  Professor Viscusi has demonstrated that there is no empirical evidence that an additional warning about health risks of smoking would be effective in affecting adult decisions on whether to smoke. Survey evidence is clear that Americans, across socio-economic backgrounds, appreciate the health risks of smoking and indeed overestimate them.  *See* Viscusi Decl. ¶¶ 33–43.  And the City has failed to come forward with any evidence remotely sufficient to satisfy strict scrutiny in this regard.  In addition, as to adults as with youth, there are less restrictive alternatives available that do not compel Plaintiffs' speech, as shown above.  *See* Section II.C.2 *supra*.

The mandated signs also "*literally* fail[]" narrow tailoring review due to their size and format.  *See Entm't Software*, 469 F.3d at 652.  The signs take up valuable space in key store locations where advertising and merchandising space is limited, thus restricting other advertising and product placement by the Retailer Plaintiffs.  *See, e.g.*, Cala Aff. ¶ 9 ("In order to post the signs required by the Resolution, I have been forced to move items that we offer for sale away from the cash register in order to make room for the signs."); Infante Aff. ¶ 9 ("There was nowhere to put the larger sign near the tobacco display without covering my other products, as eye-level wall space throughout my store is already devoted to the display of my merchandise."); *see also Entm't Software*,  469 F.3d at 653 ("Little imagination is required to envision the spacing debacle that could accompany a small retailer's attempt to fit three signs . . . into such a

space.").  In both large and small stores, the Resolution forces retailers, against their will, to subject all customers to the disturbing images and an emotional appeal to quit smoking.  *See, e.g.*, Infante Aff. ¶ 18 ("They force everyone in my store — my workers, my customers (non-smokers and smokers alike), and me — to look at an eye sore whenever they come by.").  And they do so without any reliable scientific evidence suggesting that they will decrease youth smoking rates in the City (or adult smoking rates).

Contrary to the City's argument, the mandated signs are not less burdensome than the stickers struck down in *Entertainment Software* or the theoretical graphic package labels upheld in *Commonwealth Brands, Inc. v. United States*, 678 F. Supp. 2d 512, 528–32 (W.D. Ky. 2010), *appeal docketed*, *sub nom. Discount Tobacco City & Lottery Inc., et al. v. United State et al.*, Nos. 10-5234-35 (6th Cir. Mar. 9, 2010).  The City's signs are so big that they are easily visible from the street in many instances, before a prospective customer even has a chance to enter a store.  This is a higher order of magnitude in burdening private citizens through mandated speech.

D.     **The Resolution Would Fail *Zauderer* Review.**

Because the mandated signs are not purely factual and uncontroversial statements about the health effects of smoking but rather include graphic and emotional advocacy and the Board's policy imperative to "Quit Smoking Today," the exception from strict scrutiny established in *Zauderer* for compelled disclosure of purely factual and uncontroversial information does not apply.  The Court should hold that strict scrutiny applies as a matter of law, and on that basis find a likelihood of success and enjoin the Resolution.

In any event, the Resolution would fail the *Zauderer* standard.  *Zauderer* permits the compelled disclosure of "purely factual and uncontroversial information" so long as it is

"reasonably related to the State's interest in preventing deception of consumers" and is not "unjustified or unduly burdensome." *Zauderer*, 471 U.S. at 651; *Milavetz*, 130 S. Ct. at 1339–41. Under this balancing approach, the Court must weigh the burden imposed on Plaintiffs' free speech rights against the likelihood that these burdens will reduce the prevalence of smoking. On the one side of this constitutional balance, the foregoing discussion demonstrates the substantial burden the Resolution imposes on Plaintiffs' free speech. On the other side, the City offers no expert opinion or competent scientific evidence supporting its position, while Plaintiffs' experts in behavioral psychology and economics have provided detailed testimony that the Resolution will not be effective at reducing the prevalence of smoking. Viscusi Decl. ¶¶ 55–56 ("The empirical evidence on the effectiveness of warnings has shown that reminder warnings do not provide new information and do not affect risk beliefs or behavior. Warnings that attempt to simply browbeat individuals into changing their behavior and do not provide new risk information will not be successful. Yet that is exactly the approach taken with the graphic NYC signs at issue in this case."); *id.* ¶¶ 62 (analyzing the effect of graphic warning labels on cigarette packages in other countries and concluding there is no evidence that such warnings have produced a reduction in smoking prevalence in those countries); *id.* ¶ 66 ("The general implication of the failure of [graphic warning label] policies to affect smoking rates and smoking risk beliefs is that when the public is already adequately informed of the dangers of smoking, adoption of measures such as the point-of-sale graphics in NYC will also not be effective in decreasing smoking rates."). A measure that significantly burdens free speech rights that the available empirical evidence suggests likely will be ineffective in furthering the government's interests is the very definition of an "unjustified or unduly burdensome" speech restriction under *Zauderer*. At the very least, the record shows material issues of fact under *Zauderer*. If that

29

standard is held to apply (and it should not be), then discovery and a factual hearing are warranted before any summary judgment motion is decided.

Supreme Court cases interpreting *Zauderer* further illustrate that the Resolution is both "unjustified" and "unduly burdensome."  In *Ibanez*, 512 U.S. at 146–47, for example, a Florida regulatory board sought to require accountants who wished to use any type of privately-accredited "specialist" designation to include a disclaimer explaining that the accrediting body was not affiliated with the state government and listing the body's accreditation requirements. *Id.* at 146.  The Supreme Court struck down the compelled disclosure, holding that it was unjustified and unduly burdensome because it "effectively rule[d] out notation of the 'specialist' designation on a business card or letterhead, or in a yellow pages listing" without any proof that use of the designation was in fact misleading.  *Id.* at 146–47.

The City's mandated signs are far more burdensome than the compelled disclosure in *Ibanez*.  The City has not marshaled any evidence demonstrating that the Resolution will curb youth smoking, or that youth do not already understand the dangers of smoking.  And yet, on the City's *hope* that they will have some effect on youth smoking, the signs will displace scarce advertising space in many smaller stores, will force retailers to disseminate a government-dictated message against their will, and will otherwise interfere with communications between the Retailer Plaintiffs and their adult tobacco consumers.  They plainly are "unjustified" and "unduly burdensome."  *Zauderer*, 471 U.S. at 651; *see also* Reynolds Decl. ¶ 66 (opining that the "City's general theory that warnings seen by customers immediately prior to purchase at the point of sale are the most effective is unsupported by any reliable scientific data that I have been

able to locate"); Viscusi Decl. ¶ 3 ("[T]here is no scientific evidence that the NYC point-of-sale signs will result in a statistically significant reduction in smoking initiation or tobacco use.").[8]

## III.    The Resolution Violates New York Separation of Powers Principles.

Section 21 of the New York City Charter provides that the City's legislative power is vested with the City Council and that "[a]ny enumeration[s] of powers in this charter shall not be held to limit the legislative power of the council, except as specifically provided in this charter." Thus, even though the N.Y.C. Charter delegates to the Board authority over matters relating to life and health in the City (*see* N.Y.C. Charter § 558), that delegation of authority is not "broader than that which the separation of powers doctrine permits." *Boreali v. Axelrod*, 71 N.Y.2d 1, 9, 517 N.E.2d 1350, 1353 (1987).

The City concedes that *Boreali* provides the proper framework for determining whether the Resolution violates separation-of-powers principles (Opp. 37), but contends that none of the *Boreali* factors supports a finding that its adoption of the Resolution encroached upon the City Council's legislative power. The circumstances surrounding the Board's adoption of the Resolution belie this argument.

---

[8]    Plaintiffs have argued that the crowding out effect of the large mandated signs also is a restriction on commercial speech and for that independent reason would fail review under *Central Hudson*. *See* Pls' Memorandum in Support of Mot. For a Preliminary Injunction ("Pls' Mem.") at 16 n.6. The City barely mentions this argument in its brief. If the restriction on commercial speech were the only constitutional defect, the Resolution would fail the *Central Hudson* standard. There are numerous non-speech-related alternatives to the mandated signs, and the City has offered nothing more than unsupported assertions that the graphic signs will materially advance its interest in curbing underage smoking. *See Edenfield v. Fane*, 507 U.S. 761, 767, 770–71 (1993) (under *Central Hudson*, regulation must advance substantial state interest in a "direct and material way," which is not satisfied by "mere speculation or conjecture"); *Zauderer*, 471 U.S. at 648–49 (applying *Central Hudson* and holding that the State's "unsupported assertions" were insufficient to justify a prohibition on attorney advertising). Indeed, Plaintiffs' expert testimony shows that the signs will not curb youth smoking.

*First*, the Board did in fact consider non-health-related concerns in adopting the Resolution. *See Boreali*, 71 N.Y.2d at 8–14, 517 N.E.2d at 1352–57 (holding that the weighing of "economic and social concerns" is a legislative, not administrative, function).  Both during the notice-and-comment period and at the public hearing regarding the draft Resolution, numerous commenters raised concerns over the potential economic impact of the Board's sign program (including concerns about the size and location of the signs), and others contended that the Resolution offends First Amendment values.  *See* Pls' Mem. at 28–29; *see also Leonard v. Dutchess Cnty. Dep't of Health*, 105 F. Supp. 2d 258, 266 (S.D.N.Y. 2000) (noting that the Dutchess County Board of Health had considered "non-health factors presented to it during the public hearing"); *Dutchess/Putnam Rest. v. Putnam Cnty. Dep't of Health*, 178 F. Supp. 2d 396, 402–05 (S.D.N.Y. 2001) (similar reasoning).  The Board decided to set these concerns aside— but that is a job for the New York City legislature.

The City argues that the mere presentation of non-health-related concerns to the Board is not enough to demonstrate that it crossed over into the realm of legislative policymaking.  That is true, but, as Dr. Farley, the Chairman of the Board, concedes, that is not what happened here: Rather than simply passively receiving this information, the Board acted on it by crafting the Resolution to try to address retailers' non-health-related concerns that the mandated signs would take up too much valuable advertising space.  Farley Decl. ¶ 20 ("In order for the signs to be effective, they must be large enough to be seen clearly by people who are making purchases. However, the Department appreciates that retailers have limited space at the point of sale and, after the public comment period, amended the final rule to reduce the size of the larger signs and to provide retailers with the option of posting a smaller sign at each of their cash registers in lieu of posting a larger sign at the location where tobacco products are displayed.").  The Board also

attempted to respond to many of the raised non-health-related concerns in its explanatory statement regarding the Resolution.  *See* Resolution § 181.19, Statement of Basis and Purpose; Pearson Proposal.  The City's position presumes that the only possible evidence of an administrative body considering social and economic concerns is the existence of non-health-related exceptions in an enactment (*see* Opp. 38 ("The Resolution neither makes exceptions based on the size of the business or on any other consideration.")), but *Boreali* does not support such a constrained view of how an administrative body can improperly take into account social and economic concerns when enacting a regulation.

*Second*, contrary to the City's argument, in adopting the Resolution, the Board did not fill a gap in an existing regulatory scheme, but instead wrote on a clean slate.  *See Boreali*, 71 N.Y.2d at 13, 517 N.E.2d at 1356 ("The second, and related, consideration is that in adopting the antismoking regulations challenged here the PHC did not merely fill in the details of broad legislation describing the over-all policies to be implemented.  Instead, the PHC wrote on a clean slate.").  One searches the City's brief for any mention of the legislation for which the Resolution purportedly fills in the gaps.  The City never identifies exactly to what piece of legislation the Resolution is "interstitial."

The City's argument that the Board did not write on a clean slate because the *City Charter* grants it broad authority to regulate matters of public health misses the point.  *See* Opp. 41.  The City Charter creates the powers of both the City Council and the Board—it is not broad legislation aimed at curbing smoking in the City.  The Resolution's regulation of smoking simply is not "interstitial" to the City Charter in any sense.  Moreover, although "smoking regulation[], [is] an area . . . especially suited for legislative determination as it involves 'difficult social problems' which must be resolved 'by making choices among competing ends'" (*Justiana v.*

*Niagara Cnty. Dep't of Health*, 45 F. Supp. 2d 236, 244 (W.D.N.Y. 1999) (quoting *Boreali*, 71 N.Y.2d at 13, 517 N.E.2d at 1356)), the City champions the Resolution as taking a "pioneering approach" (Opp. 2) to point of sale warnings—another clue that the Board was not merely filling in the gaps of a comprehensive legislative scheme regarding smoking. *See Am. Kennel Club, Inc. v. City of New York*, Index No. 13584/89, *9–10 (N.Y. Sup. Ct. Sept. 19, 1989) (unreported) (finding ordinance was not interstitial because it "provide[d] for a number of firsts"). In New York, policy frontiers are for democratically-elected leaders, not administrative agencies.[9]

*Third*, the Board exercised no special expertise or technical competence in developing the sign program. *See Boreali*, 71 N.Y.2d at 13–14, 517 N.E.2d at 1356. The health risks associated with smoking are well-known, and, despite the City's argument to the contrary, the Board did not bring any scientific or health expertise to bear in creating the mandated signs. *Cf. id.* (holding that "no special expertise or technical competence in the field of health was involved in the development of the antismoking regulations challenged" in the case where the Health Council had "drafted a simple code describing the locales in which smoking would be prohibited").

*Fourth*, although it is true that the City Council has not attempted and failed to pass a law requiring the posting of graphic anti-smoking signs at the point of sale, the Council repeatedly has legislated in the area of tobacco and smoking regulation. *See, e.g.*, New York City Administrative Code §§ 17-501 *et seq.* (Smoke Free Air Act); Rules of the City of New York

---

[9]   Although the City now claims that the Resolution "does not regulate smoking, only businesses that sell tobacco products" (Opp. 40), the Board clearly held a different view when it adopted the Resolution. The Board's Statement of Purpose in adopting the Resolution makes clear that the Resolution is designed to "curb smoking within the City." *See* Resolution 181.19, Statement of Basis and Purpose.

§§ 10-01 *et. seq.* (implementing regulations).  The City's legislative body has not been silent on the issue of smoking.

*Boreali* makes clear that the City Charter's broad grant of authority to the Board over matters of public health does not, absent a more specific authorization from the City Council, vest the Board with the power to expand on longstanding federal warnings regarding cigarette smoking and health and thereby to intrude on federal law and to violate Plaintiffs' First Amendment rights.  Because the Resolution represents the very kind of policymaking that must be left to the City Council, it must be set aside.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court preliminarily enjoin enforcement of the Resolution, deny the City's motion for summary judgment, and enter summary judgment in favor of Plaintiffs.


Dated:  September 24, 2010

By:  /s/ Floyd Abrams
Floyd Abrams (FA 0902)
Joel Kurtzberg (JK 1552)
Kayvan Sadeghi (KS 7463)
CAHILL GORDON & REINDEL  LLP
80 Pine Street
New York, New York  10005
(212) 701-3120
fabrams@cahill.com
jkurtzberg@cahill.com
ksadeghi@cahill.com

*Counsel for Plaintiffs 23–34 94th Street
Grocery Corp., Kissena Blvd.
Convenience Store, Inc., New York
Association of Convenience Stores, and
New York State Association of Service
Stations and Repair Shops, Inc.*

GIBSON, DUNN & CRUTCHER LLP
By:  /s/ Michael J. Edney
Miguel A. Estrada (ME 4227)
Michael J. Edney *
Brian D. Boone *

*admitted pro hac vice*

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com
medney@gibsondunn.com
bboone@gibsondunn.com

Jennifer H. Rearden (JR 2552)
200 Park Avenue
New York, New York  10166
Telephone: (212) 351-4000
jrearden@gibsondunn.com

*Counsel for Plaintiff Philip Morris USA Inc.*

By:  /s/ D. Theodore Rave
Noel J. Francisco*
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C.  20001
(202) 879-3939
njfrancisco@jonesday.com

*admitted pro hac vice*

D. Theodore Rave (DR 1979)
JONES DAY
222 East 41st Street
New York, New York  10017
(212) 326-3939
drave@jonesday.com

*Counsel for Plaintiff R.J. Reynolds
Tobacco Co.*

By:  /s/ Alan Mansfield
Alan Mansfield (AM 3266)
Stephen L. Saxl (SS 1028)
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York  10166
(212) 801-9200
mansfielda@gtlaw.com
saxls@gtlaw.com

*Counsel for Plaintiff Lorillard Tobacco
Company*